# United States Court of Appeals

## For the Eighth Circuit

_____

No. 13-3581

_____

James Lawrence Marshall; Joseph Michael Senser; Dante Anthony Pastorini

*Plaintiffs - Appellants*

Fred Barnett; Tracy Simien; Darrell Alexander Thompson; James Nathaniel
Brown; Mark Gregory Clayton; Irvin Acie Cross; Brian Duncan; Billy Joe Dupree;
Michael James Haynes; Paul James Krause; Reginald McKenzie; Reginald Joseph
Rucker; Jackie Larue Smith, on behalf of themselves and all others similarly situated

*Plaintiffs - Appellees*

John Frederick Dryer; Elvin Lamont Bethea; Edward Alvin White; Lemuel Joseph
Barney; Bruce Allan Laird; Preston Pearson; Jim Ray Smith

*Plaintiff*s

v.

National Football League

*Defendant - Appellee*

_____

No. 13-3582

_____

Marcus Dell Gastineau; Abdul Salaam

*Plaintiffs - Appellants*

Fred Barnett; Tracy Simien; Darrell Alexander Thompson; James Nathaniel Brown; Mark Gregory Clayton; Irvin Acie Cross; Brian Duncan; Billy Joe Dupree; Michael James Haynes; Paul James Krause; Reginald McKenzie; Reginald Joseph Rucker; Jackie Larue Smith, on behalf of themselves and all others similarly situated

*Plaintiffs - Appellees*

John Frederick Dryer; James Lawrence Marshall; Joseph Michael Senser; Elvin Lamont Bethea; Dante Anthony Pastorini; Edward Alvin White; Lemuel Joseph Barney; Bruce Allan Laird; Preston Pearson; Jim Ray Smith

*Plaintiff*s

v.

National Football League

*Defendant - Appellee*
_____

No. 13-3666
_____

Jed Weaver

*Plaintiff - Appellant*

Fred Barnett; Tracy Simien; Darrell Alexander Thompson; James Nathaniel Brown; Mark Gregory Clayton; Irvin Acie Cross; Brian Duncan; Billy Joe Dupree; Michael James Haynes; Paul James Krause; Reginald McKenzie; Reginald Joseph Rucker; Jackie Larue Smith, on behalf of themselves and all others similarly situated

*Plaintiffs - Appellees*

John Frederick Dryer; James Lawrence Marshall; Joseph Michael Senser; Elvin Lamont Bethea; Dante Anthony Pastorini; Edward Alvin White; Lemuel Joseph Barney; Bruce Allan Laird; Preston Pearson; Jim Ray Smith

*Plaintiff*s

v.

National Football League

*Defendant - Appellee*

_____

Appeals from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: December 10, 2014
Filed: May 21, 2015

_____

Before BYE, SMITH, and KELLY, Circuit Judges.

_____

BYE, Circuit Judge

Six former National Football League ("NFL") players ("Appellants") appeal the district court's approval of the class-action settlement between nearly 25,000 class members and the NFL. The negotiated settlement agreement resolves the litigation surrounding the NFL's use of former NFL players' likenesses and identities. The complex settlement—a product of numerous settlement conferences and years of litigation—provides two unique benefits to the class: (1) the establishment of a licensing agency to assist former NFL players in marketing their publicity rights with the support of the NFL; and (2) up to a $42 million payout by the NFL for the benefit

of the class. Appellants contend the district court[1] abused its discretion in approving the settlement because it does not provide for a direct financial payment to each class member and is not fair, reasonable, and adequate. We affirm.

I

The class action complaint alleges that for many years NFL Films—the commercial filmmaking wing of the NFL—has used the names, images, likenesses, and identities of former NFL players in its various videos to generate revenue and promote the NFL. The NFL Films videos are "promotional film productions with scripts, music, editing, direction and production completely independent of the play and production of the games themselves." They seek to provide fans with the story of the game, such as the "perspective of the game that perhaps [fans] were not aware of when they watched the broadcast on network television." According to Appellants, the use of the players' likenesses and identities has helped the NFL gain substantial profits and improve its brand.

In 2009, Appellants brought this class action against the NFL on behalf of a class of former NFL players whose name, voice, image, or likeness was used by the NFL to gain profit or promote the NFL. The class asserted claims for false endorsement under the Lanham Act, 15 U.S.C. § 1125, common law and statutory rights of publicity claims under several states' laws, and unjust enrichment. The NFL moved for judgment on the pleadings, contending the claims failed because they were either precluded by the First Amendment, preempted by the Copyright Act, or were insufficient to constitute false endorsement. At the pleadings stage, the district court denied the motion, and the parties proceeded to discovery. More than two years into the litigation, the NFL moved for partial summary judgment on issues regarding

---

[1]The Honorable Paul A. Magnuson, United States District Judge for the District of Minnesota.

choice of law and the applicable statute of limitations. The district court held that all claims prior to August 23, 2003, were time-barred, all claims arising between August 23, 2003, and August 1, 2004, were governed by Minnesota's statute of limitations, and that it was premature to determine the choice of law and applicable statute of limitations for all remaining claims.

On December 12, 2012, pursuant to Federal Rule of Civil Procedure 23(d) and (g), the Magistrate Judge[2] appointed a lead settlement counsel to act as a single representative for the class in settlement discussions. See Dryer v. Nat'l Football League, No. 09-2182 (PAM/AJB), Dkt. No. 250, at *1 (D. Minn. Dec. 12, 2012). The Magistrate Judge explained that lead settlement counsel was necessary because the settlement discussions and settlement process stalled due to "serious disagreements among the three lead counsel for Plaintiffs." Id., Dkt. No. 252, at *1. The Magistrate Judge hoped to "restart the settlement negotiations without the distractions presented by Plaintiffs' co-lead counsel's disagreements and to protect the interests of the putative class as a whole." Id. at *2.

On March 18, 2013, the plaintiffs filed a second amended complaint, adding other named plaintiffs, and a motion for preliminary approval of the settlement agreement. In summary form, the complex sixty-page settlement agreement provides for the following:

(1) The creation of the Common Good Entity, a non-profit organization;
(2) Payment of up to $42 million by the NFL to the Common Good Entity over eight years;
(3) The establishment of the Licensing Agency;

[2]The Honorable Arthur J. Boylan, United States Magistrate Judge for the District of Minnesota, now retired.

(4) Payment of $100,000 worth of media value to the Licensing Agency each year until 2021;

(5) Payment of attorneys' fees and settlement administration expenses;

(6) A reserve for the NFL's potential fees and costs of litigation involving class members who opt out of the settlement; and

(7) The class members' perpetual release of any claims and all their publicity rights for the NFL and its related entities to use.

The Common Good Entity is "dedicated to supporting and promoting the health and welfare of Retired Players and other similarly situated individuals." Under the settlement, the NFL is obligated to pay up to $42 million over eight years to the Common Good Entity, which will then disburse the money to charitable organizations or health and welfare organizations for the benefit of class members. Disbursement from the Common Good Entity may only be for (1) medical research; (2) short-term and long-term housing; (3) health and dental insurance coverage; (4) medical screening and evaluations; (5) mental health programs; (6) wellness programs; (7) career transition programs; (8) any medical costs not covered by health insurance; and (9) other uses as approved by the Board of Directors of the Common Good Entity. After ten years, any remaining funds initially contributed by the NFL revert back to the NFL for its charitable use. The NFL may also deduct up to $13.5 million from the $42 million obligation for any expenses related to litigation involving class members who opt out of the settlement.

The Licensing Agency created by the settlement allows for one-stop shopping for those seeking to purchase the publicity rights of former NFL players. Like the Common Good Entity, the Licensing Agency is an organization with a Board of Directors that includes class members. Class members may provide authorization (or withdraw it at any time) for the Licensing Agency to license the player's publicity rights to opportunities identified by the Licensing Agency. The Licensing Agency has selected IMG, one of the largest and most successful sports marketing firms in the

world, to assist its operations and identify marketing and business opportunities. Under the settlement, the NFL is obligated to provide $100,000 worth of media value each year until 2021 for the Licensing Agency's commercials. The NFL is also obligated to work cooperatively with the Licensing Agency for referral business and opportunities and, in good faith as it would with any other licensee, provide any potential licensee of the Licensing Agency with licensing for the NFL shield trademark or copyrighted game footage. Proceeds from the Licensing Agency will be divided between the Common Good Entity and the class member whose rights are sold, with the class member receiving seventy-five percent of the proceeds. The Licensing Agency is expected to significantly reduce transaction costs and unlock the value of the group publicity rights of the class members.

After a hearing, the district court preliminarily approved the settlement and certified the class under Rule 23(b)(3). Over the objections of several named plaintiffs, the district court reasoned the settlement was fair, reasonable, and adequate because it provided a "direct[] benefit[ to] those in whose name th[e] lawsuit was purportedly brought." Dryer v. Nat'l Football League, No. 09-2182 (PAM/AJB), Dkt. No. 270, at *2 (D. Minn. Apr. 8, 2013). The court also rejected the notion that the settlement constituted an improper *cy pres* distribution. Id. at *4. Upon notice to all class members and the expiration of the exclusion and objection deadlines, and after a hearing for the final approval of the settlement, the district court issued its order approving the settlement. When the opt-out period closed, nearly 25,000 class members remained and 2,073 sought to opt out. Dryer v. Nat'l Football League, No. 09-2182 (PAM/AJB), 2013 WL 5888231, at *1 (D. Minn. Nov. 1, 2013). Another thirty-eight made an untimely request, and one more inadvertently withdrew his exclusion request, all of whom were excluded from the class. Id. Nineteen members filed objections, seven of whom also requested to be excluded. Id. After a supplemental notice was issued because of a violation of a preliminary injunction put in place by the district court, 158 class members timely withdrew their requests for exclusion and 6 filed untimely requests; all were included in the class. Id. at *2.

## II

"We generally review for abuse of discretion a 'district court's decision to approve [a] global settlement over' objections." In re Uponor, Inc. F1807 Plumbing Fittings Prods. Liab. Litig., 716 F.3d 1057, 1063 (8th Cir. 2013) (alteration in original) (quoting In re BankAmerica Corp. Sec. Litig., 350 F.3d 747, 752 (8th Cir. 2003)). "Only upon the clear showing that the district court abused its discretion will this court intervene to set aside a judicially approved class action settlement." Reynolds v. Nat'l Football League, 584 F.2d 280, 283 (8th Cir. 1978). We have explained that considerable deference is due to the district court's approval of a settlement:

> [The] determination is committed to the sound discretion of the trial judge. Great weight is accorded his views because he is exposed to the litigants, and their strategies, positions and proofs. He is aware of the expense and possible legal bars to success. Simply stated, he is on the firing line and can evaluate the action accordingly.

Van Horn v. Trickey, 840 F.2d 604, 606-07 (8th Cir. 1988) (quoting Grunin v. Int'l House of Pancakes, 513 F.2d 114, 123 (8th Cir. 1975)). "A settlement agreement is 'presumptively valid.'" In re Uponor, 716 F.3d at 1063 (quoting Little Rock Sch. Dist. v. Pulaski Cnty. Special Sch. Dist. No. 1, 921 F.2d 1371, 1391 (8th Cir. 1990)). "[M]indful of the limited scope of our review . . . [w]e ask whether the District Court considered all relevant factors, whether it was significantly influenced by an irrelevant factor, and whether in weighing the factors it committed a clear error of judgment." Little Rock Sch. Dist., 921 F.2d at 1391.

The district court may only approve a class action settlement if it is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). To make the determination, the district court must consider four factors: "(1) the merits of the plaintiff's case weighed against the terms of the settlement, (2) the defendant's financial condition,

(3) the complexity and expense of further litigation, and (4) the amount of opposition to the settlement." In re Uponor, 716 F.3d at 1063 (quoting Van Horn, 840 F.2d at 607). "The single most important factor in determining whether a settlement is fair, reasonable, and adequate is a balancing of the strength of the plaintiff's case against the terms of the settlement." Van Horn, 840 F.2d at 607.

Before addressing these four factors, we must first address Appellants' initial challenge that the settlement fails as a matter of law. Although the three sets of appellants present the arguments in varying ways, they distill to two principled arguments: the settlement fails because (1) it does not provide any direct benefit to the class; and (2) it makes the financial payment to a third-party and not each class member directly.

We begin with the guiding principle that "a class action settlement is a private contract negotiated between the parties." In re Wireless Tel. Fed. Cost Recovery Fees Litig., 396 F.3d 922, 934 (8th Cir. 2005). The court's role in reviewing a negotiated class settlement is to "to ensure that the agreement is not the product of fraud or collusion and that, taken as a whole, it is fair, adequate, and reasonable to all concerned." Id.

Appellants argue the settlement fails because it offers no benefit to the class. They attempt to characterize the settlement as simply giving away their proceeds to a third-party charity. Plainly, this is not true and the argument is wholly without merit. As more fully discussed below, the settlement agreement provides for two substantial and direct benefits to the class as a whole: the Licensing Agency and a payment of up to $42 million for the benefit of the class.

Appellants also argue the settlement fails because the financial payout for the class is made through a third-party organization and not directly to each class member. But we have never required that a settlement agreement specifically provide

for a direct financial payment to each class member, and the mere fact that some members of a class may not receive a direct payment is not dispositive. See In re Wireless, 396 F.3d at 934; see also Petrovic v. Amoco Oil Co., 200 F.3d 1140, 1146 (8th Cir. 1999) ("It seems to us that almost every settlement will involve different awards for various class members."). As the Third Circuit has noted, "some courts allow a settlement to require a payment only to a third party, that is, to provide no recovery at all directly to class members." In re Baby Prods. Antitrust Litig., 708 F.3d 163, 172 (3d Cir. 2013) (quoting American Law Institute ("ALI"), Principles of the Law of Aggregate Litig. § 3.07, comment a (2010)).

In this case, we do not need to decide if, or under what circumstances, parties to a class-action settlement may agree to provide a payment to a third party without a direct benefit to class members. Here, the financial payment to the third-party organization is not the only, or perhaps even the primary, benefit of the settlement agreement. *All* class members receive a direct benefit from the settlement: the opportunity to license their publicity rights through the established Licensing Agency, as well as the payments by the NFL to the Licensing Agency. If the players' publicity rights are as valuable as Appellants claim, the players should be able to realize the value of their publicity rights through the Licensing Agency. While the parties disagree on the value of the Licensing Agency to the different class members, the district court held that through the Licensing Agency class members "finally ha[d] an avenue to pursue commercial interests in their own images . . . [and] for the first time in conjunction with the NFL's copyrights and trademarks." Dryer, 2013 WL 5888231, at *1. Thus, even in the absence of any financial payout, the settlement would not fail as a matter of law. See, e.g., In re Mexico Money Transfer Litig., 267 F.3d 743, 748 (7th Cir. 2001) (noting that the settlement was "one of many class actions in which everyone other than the plaintiffs has been paid in cash," that this was "enough to raise suspicions" that the settlement may not be fair, but that the court must "ask whether the value of relief in the aggregate is a reasonable approximation of the value of plaintiffs' claim"); In re Gen. Motors Corp. Pick-Up Truck Fuel Tank

Prods. Liab. Litig., 55 F.3d 768, 803 (3d Cir. 1995) (noting concern that settlement may not be fair because it "involve[d] only non-cash relief"). This is not a case in which the district court approved a settlement with no direct benefit to each class member.

Furthermore, although the $42 million is not paid directly to class members, the money is clearly designated for the benefit of the class. The Common Good Entity is obligated to "administer the [money] consistent with the provisions of [the] Settlement Agreement" for the benefit of class members. In this way, the Common Good Entity's administration of the substantial financial payout is not unlike the establishment of a trust for the benefit of the class, which courts have frequently found permissible. See, e.g., Cobell v. Salazar, 679 F.3d 909, 914 (D.C. Cir. 2012); In re Diet Drugs Prods. Liab. Litig., No. 14-2729, 2015 WL 758455, at *1 (3d Cir. Feb. 24, 2015); Int'l Union, United Auto., Aerospace, and Agric. Implement Workers of Am., 497 F.3d 615, 624 (6th Cir. 2007); Fanning v. United States, 346 F.3d 386, 390 (3d Cir. 2003); Nat'l Treasury Emps. Union v. United States, 54 Fed. Cl. 791, 795 (Fed. Cl. 2002). Therefore, we do not believe the mere fact that the financial payout for the benefit of the class is made through a third party renders the settlement impermissible. The relevant question is for whom the money will be used, not whose name appears on the check. Appellants cite to no authority holding to the contrary. Rather, they rely on cases involving *cy pres* distributions in which a district court *orders* the payment of any *unclaimed* class funds to a third-party.[3] Here, we deal not

[3]At the district court, the objecting class members argued the settlement agreement constituted a *cy pres* distribution. On appeal, no one expressly argues the settlement is actually a *cy pres* distribution, and one set of appellants specifically states they "wholeheartedly agree" with the district court that the settlement is *not* a *cy pres* distribution.

"The *cy pres* doctrine originated as a rule of construction to save a testamentary charitable gift that would otherwise fail, allowing 'the next best use of the funds to satisfy the testator's intent as near as possible.'" In re Airline Ticket Comm'n

with the *court's authority* to distribute unclaimed funds to a third party unrelated to the class but the *parties' ability* to decide how to best distribute funds recovered in a class action for the benefit of the class.

Courts have specifically found settlement agreements with a structure similar to the one in this case as a permissible and favorable way to resolve complex litigation disputes. For example, in <u>Lane v. Facebook</u>, the plaintiffs brought a class action against Facebook and other corporate entities for Facebook's improper publishing of private information regarding what its members did elsewhere on the Internet. 696 F.3d 811, 816 (9th Cir. 2012), <u>cert denied</u>, 134 S. Ct. 8 (2013). Specifically, numerous company websites reported certain activity by customers to Facebook; Facebook then published the activity on the member's profile page and broadcast it for others to see. <u>Id.</u> The parties settled the class-action lawsuit under a settlement agreement that required Facebook to pay $9.5 million, from which the 22 named class members received a total of $39,000, the 3,663,632 unnamed class members received no payments at all, and the majority of funds went to establishing a new charitable foundation that would help fund other organizations dedicated to educating the public about online privacy. <u>Id.</u> at 817.

---

Antitrust Litig., 268 F.3d 619, 625 (8th Cir. 2001) (quoting <u>Democratic Cent. Comm. v. Washington Metro. Area Transit Comm'n</u>, 84 F.3d 451, 455 n.1 (D.C. Cir. 1996)). In class-action litigation, it is commonly used to refer to the distribution of any unclaimed class funds. <u>Cf.</u> <u>In re BankAmerica Corp. Sec. Litig.</u>, 775 F.3d 1060, 1063 (8th Cir. 2015) ("In recent years, federal district courts have disposed of unclaimed class action settlement funds after distributions to the class by making '*cy pres* distributions.'"); <u>Klier v. Elf Atochem N. Am., Inc.</u>, 658 F.3d 468, 475 (5th Cir. 2011). The settlement agreement here did not provide for—nor did the district court direct—that any *unclaimed* money be paid out to a non-class member. Therefore, we do not believe the settlement agreement is a *cy pres* distribution merely because part of the benefit through the settlement agreement is offered through a third-party organization.

-12-

The structure of the settlement agreement in <u>Lane</u> was in many ways similar to the settlement in this case: it provided no direct financial payout to all class members, save the named plaintiffs, and it paid the class funds to a newly-created non-profit organization. It also differed in at least two key respects. First, the non-profit organization in <u>Lane</u> was not obligated to spend any of the funds it received for the benefit of any class members, which the court found made it a *cy pres* distribution. Conversely, the Common Good Entity is bound to disburse the financial payout by the NFL for the benefit of the class under specifically identified purposes. Second, the class members in <u>Lane</u> received no direct benefit whatsoever—financial or otherwise. In contrast, even setting aside the benefit of the $42 million payout, all class members here received the benefit of the Licensing Agency.

The settlement agreement in this case provided for a direct benefit to all class members and a substantial financial payment by the NFL for the benefit of class members. We do not believe it fails as a matter of law merely because it does not provide a specific financial payout to each class member or because the financial payment is made through a third-party organization.[4] The settlement agreement

---

[4]We also reject Appellants' argument that the district court's approval of the settlement violates the Rules Enabling Act, codified in 28 U.S.C. § 2072.

Under the Rules Enabling Act, the Federal Rules of Civil Procedure "shall not abridge, enlarge or modify any substantive right." 28 U.S.C. § 2072(b). Thus, a district court, generally, may not award substantive relief in a class-action lawsuit merely because it is brought in the context of a class action. However, Appellants present no case holding that the Rules Enabling Act limits the type of relief parties themselves may agree to, so long as the court remains convinced the settlement is "fair, reasonable, and adequate." As noted above, a class-action settlement—like any settlement—is a private contract of negotiated compromises. The agreement is not a "substantive adjudication of the underlying causes of action," and therefore, approval of the settlement agreement does not implicate the Rules Enabling Act. <u>See</u> <u>In re Baby Prods.</u>, 708 F.3d at 173 n.8 ("Because a district court's certification of a settlement simply recognizes the parties' deliberate decision to bind themselves

-13-

passed the district court's scrutiny, and we find no evidence whatsoever that the court failed to fulfil its duty to serve as a guardian for the rights of the absent class members. Accordingly, we consider whether the district court abused its discretion in finding the settlement agreement fair, reasonable, and adequate under the traditional four-factor analysis.

## A - The Defendant's Financial Condition

The district court found that the NFL is in good financial standing, which would permit it to adequately pay for its settlement obligations or continue with a spirited defense in the litigation. No party disagrees with this finding. As such, we find this factor neutral.

## B - The Complexity and Expense of Further Litigation

Class actions, in general, "place an enormous burden of costs and expense upon [] parties." Schmidt v. Fuller Brush Co., 527 F.2d 532, 535 (8th Cir. 1975). Where, as here, the class members' claims involve complex legal questions, conflicts of law analyses, the application of numerous states' laws, and individualized damages for each class member that are speculative and difficult to estimate, the enormity of the burden is obvious.

---

according to mutually agreed-upon terms without engaging in any substantive adjudication of the underlying causes of action, we do not believe the inclusion of a *cy pres* provision in a settlement runs counter to the Rules Enabling Act." (internal quotation marks and citation omitted)); Sullivan v. DB Invs., Inc., 667 F.3d 273, 312 (3d Cir. 2011) (en banc) ("[T]he proposed settlement could not violate the Rules Enabling Act since a court's approval of a voluntary settlement, by nature a compromise of rights, does not affect substantive state rights." (internal quotation marks omitted)); cf. Klier, 658 F.3d at 482 (Jones, J. concurring) (suggesting that *cy pres* distributions may violate the Rules Enabling Act when "*judges award* surplus settlement funds to charities and civic organizations" (emphasis added)).

Before settling, the parties had already spent three years in litigation and had not yet even achieved class certification. As discussed in more detail below, the resolution of the publicity rights claims would have required tremendous efforts regarding issues of statutes of limitation for the various class members' home states, complex conflict of laws analyses involving multiple states, the application of numerous states' common and statutory publicity rights laws, affirmative defenses involving constitutional principles, and the review of each individual player's contract.

Even when the applicable law for each of the nearly 25,000 class members was determined, the effort would have only began, as the parties would have vociferously disputed and fought over the amount of damages to which each class member was entitled. Each class member's likeness was used in varying NFL Films' videos, in varying frequency during those videos, and in varying focus. The discovery associated with determining this would have been substantial to say the least. Furthermore, each class member's notoriety and recognition also varies. Thus, once the parties identified and isolated each class member's appearances in the videos, they would have had to present evidence regarding what they believed such appearance merited in value. Undoubtedly, each party would have obtained competent and qualified (and expensive) experts to provide an evaluation on what each player's appearance during the varying NFL Films' videos was worth, but given the speculative endeavor of such a task, the effort to reach an amount of damages for each class member—to be persuasive—would have been substantial. Multiplying that for the nearly 25,000 class members upgrades it to Herculean.[5]

---

[5]Appellants argue that, under restitutionary principles, damages can simply be calculated by determining the amount of gain the NFL received by using the former players' likenesses. Even assuming that separating the value of the players' likenesses from the creative presentation and other unique elements of the NFL Films' videos would be a more simplistic task, regardless of how the damages for all former players' claims are calculated in the collective, to allocate the proceeds each individual player

Finally, as the district court recognized, the fact that the NFL specifically retained $13.5 million as a reserve for any litigation resulting from opt-outs is strongly indicative that the real sum for the class-action litigation, particularly for the plaintiffs who carried the burden of proving their damages, would have been much higher.

Therefore, the district court correctly reasoned that this factor heavily favors approval of the settlement agreement.

## C - Amount of Opposition to the Settlement

The weight of this factor depends upon the viewpoint of the opposition. When the opposition is considered from the view of the named plaintiffs, the amount is considerable: six of the twenty-three class representatives objected to the settlement. When considered from the viewpoint of the entire class, it is not substantial—less than ten percent of the class opted out of the settlement. We have previously approved class-action settlements even when almost half the class objected to it. See, e.g., VanHorn, 840 F.2d at 606 (180 of 400 inmates objecting). We have approved a class-action settlement even when all named plaintiffs opposed it. See Elliott v. Sperry Rand Corp., 680 F.2d 1225, 1226-27 (8th Cir. 1982) (finding no abuse of discretion even though both named plaintiffs objected to it and 790 of approximately 3,000 members objected). While Appellants fault the district court for failing to agree with them, it is clear the district court listened to all of their objections, carefully considered them, and explained its rationale for rejecting them.

The fact that a considerable number of the named plaintiffs objected to the settlement suggests it may not have been particularly favorable to what they believed

is entitled, the court would still need to determine each player's entitlement based on the use and value of his likeness individually.

-16-

*their particular* claims were worth. The fact that less than ten percent of the entire class opted out of the settlement—despite conscious efforts by some class members to persuade the other class members of unfairness—suggests it was favorable to what most members believed their claims were worth. The named plaintiffs were likely some of the individuals who by settling were giving up the greatest potential direct financial payout. But they were not required to forgo what they believed to be meritorious claims—they could have opted out of the settlement to pursue their own claims, as some class members did.

The district court was keenly aware of its role to serve as the guardian of the absent class members, which was "especially important [in this case], given the rhetoric and conflict among the members of the Settlement Class, who in the usual case would be zealously protecting those rights." Dryer, 2013 WL 5888231, at *2. It is obvious that in approving the settlement, the district court overwhelmingly believed the settlement was fair, reasonable, and adequate for the majority of the class, which happened to be the quiet, absent majority:

> [T]he objectors want a financial payout more than they want to embrace the reality of the limitations of their claims. Fortunately for the absent class members, experienced counsel and a knowledgeable and extremely capable Magistrate Judge saw the case for what it was, and negotiated a settlement that is truly one-of-a-kind, and a remarkable victory for the class as a whole.

Id. The district court refused to give credence to the vocal minority that focused on receiving a direct financial payout, which the district court believed was a "very mistaken belief that they could reap significant financial benefits from continuing this case." Id. Indeed, the court aptly noted that "only one-tenth of one percent of the class objected, and less than ten percent of the class ha[d] requested exclusion from the settlement." Id. This was in accord with the district court's "duty to the silent majority as well as the vocal minority." In re Wireless, 396 F.3d at 933.

-17-

Under the specific circumstances of the class claims and disparity in the potential payout for individual damages at issue in this case, and the posture in which they were litigated, we believe the amount of opposition from the substantial absent majority is better indicative of the opposition to the settlement as a whole. Accordingly, we find this factor, too, favors approval of the settlement agreement.

## D - The Merits of the Plaintiffs' Case Weighed Against the Terms of the Settlement

The most important consideration in the analysis requires balancing the strength of the plaintiffs' case against the value of the settlement terms to the class. The district court held "there is no question that the factor weighs heavily in favor of the settlement." Dryer, 2013 WL 5888231, at *4.

## 1 - The Merits of the Plaintiffs' Case

The district court held "the chances that this lawsuit—or indeed any class-action lawsuit seeking to recoup sums for the alleged infringement of former NFL players' publicity rights by NFL Films—will succeed are slim at best" because "[t]oo many obstacles stand in the way of that success." Id. at *2. Those obstacles come in the form of four barriers: (1) statute of limitations; (2) issues related to class certification; (3) plausible affirmative defenses; and (4) lack of substantial damages for most of the class.

First, because of the six-year statute of limitations "no Plaintiff [was] entitled to compensation for any unauthorized use of his image before 2003." Id. at *4. Thus, "the statute of limitations would bar the claims of many members." Id. No one disputes this limitation.

Second, the district court convincingly explained its many concerns with potential class certification. For instance, the district court rejected the notion that New Jersey law would apply for all plaintiffs' publicity rights claims and believed it would need to apply Minnesota conflict of laws to determine *if* there is a conflict among the states' laws, which may include the laws of the states in which the plaintiffs reside, in which the plaintiffs played football, under which the contracts are governed, and the home states of the NFL and NFL Films. Some of these states provide for publicity rights by statute, some by common law, while some do not recognize any such rights. In the states that recognize such a cause of action, some states treat it as a tort, while others treat it as a property right. Because the district court would be required to apply individualized choice-of-law analysis for each plaintiff's claim in the class action, see Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 822-23 (1985), the district court found that with a class of nearly 25,000 individuals, "the choice-of-law inquiry [would be] extremely complex and weighs heavily against ultimate certification of the class." Dryer, 2013 WL 5888231, at *5. In addition, the question of damages for each player is highly individual. How often they appeared, in what capacity, and, most importantly, what the value is of their appearance will be very dependant on each individual class member.

Third, the NFL advanced plausible affirmative defenses that may have entirely precluded any recovery. For example, the NFL reiterates on appeal, with supporting evidence, that former NFL players understood and consented to the NFL's use of their likenesses for many years and even provided voluntary interviews to be used in the NFL Films' videos. The NFL also argued the NFL Films' videos are "entertainment programming, not commercial speech," and are thus subject to First Amendment protection. In a litigation in California state court involving similar issues, the court denied class certification and eventually found that the use of baseball players' publicity rights was protected by the First Amendment. See Gionfriddo v. Major League Baseball, 114 Cal. Rptr. 2d 307, 318 (Cal. Ct. App. 2001) ("Balancing plaintiffs' negligible economic interests against the public's enduring fascination with

-19-

baseball's past, we conclude that the public interest favoring the free dissemination of information regarding baseball's history far outweighs any proprietary interests at stake."). In finding that the First Amendment barred baseball players' right of publicity claims for the use of their names, likenesses, and statistics in fantasy baseball games, this Court found the reasoning in Gionfriddo persuasive. See C.B.C. Distrib. and Mktg., Inc. v. Major League Baseball Advanced Media, L.P., 505 F.3d 818, 823 (8th Cir. 2007) ("The Supreme Court has directed that state law rights of publicity must be balanced against first amendment considerations, see Zacchini v. Scripps-Howard Broad., 433 U.S. 562 (1977), and here we conclude that the former must give way to the latter."). As discussed below, the district court, in dismissing the claims of the members who opted out of the class, found these and other defenses meritorious.

Finally, even if the plaintiffs obtained class certification and overcame all of the NFL's affirmative defenses, for most, the damage potential was not particularly large. The district court recognized that for a few members of the class, the potential could be "substantial." For many, however, the payout would be minimal. Indeed, the court noted the lack of "likelihood of any individual incurring enough damages on their claims to make pursuit of individual actions worthwhile." Dryer, 2013 WL 5888231, at *7 n.2. Moreover, any damage calculation for the value of publicity rights for minor appearances during an NFL Films' video would be very speculative:

> Plaintiffs played a team sport, where at any given time there are 22 men on the field of play. Any image from a game would almost by necessity include more than one individual and often includes many individuals. The apportionment of publicity-rights damages among the individuals featured—whether players, coaches, sideline workers, officials, cheerleaders, or others—is a Herculean task.

Id. at 7. Therefore, if Appellants are wrong about their likelihood of success along any step of the way, *all* plaintiffs will gain nothing and lose not only the benefit of

a large sum of money devoted to them but also the benefits offered by the Licensing Agency. Appellants, who believe they are due a substantial payout, still argue they would have been better off without settlement because they were likely to prevail at trial and obtain substantial damages. We have repeatedly rejected arguments "that compromise was unnecessary because [the party] would have prevailed at trial." Prof'l Firefighters Ass'n of Omaha, Local 385 v. Zalewski, 678 F.3d 640, 649 (8th Cir. 2012). Appellants Marcus D. Gastineau and Abdul Salaam argue they "have compromised claims against the NFL that have substantially greater value than retired players whose game footage has never been used by the NFL." But if Gastineau and Salaam were so confident in the likelihood of a substantial payout for their claims, they could have opted out of the settlement to pursue their own claims, as some class members did.

In fact, the three appellants who opted out of the settlement and proceeded to the merits of their claims had their claims entirely dismissed by the district court.[6] In the order granting summary judgment in favor of the NFL, the court found that the NFL Films' videos were not commercial speech and that after "[a]n evaluation[, ] the full record show[ed] that the balance between Plaintiffs' publicity rights and the constitutional protection due the uses involved here tip[ped] decidedly in favor of the NFL." Dryer v. Nat'l Football League, No. 09-2182 (PAM/FLN), 2014 WL 5106738, at *10 (D. Minn. Oct. 10, 2014). Moreover, the court concluded that even if the videos were commercial speech, the plaintiffs still failed to demonstrate "genuine issues of fact in the record to establish their publicity-rights claims." Id. at *11. Notably, the court also rejected the plaintiffs' argument that New Jersey law should

---

[6]Other former NFL players who opted out of the settlement initiated actions in different districts, which were then transferred to the District of Minnesota. See Culp v. NFL Prods., LLC, No. 13-7815 (NLH/JS), 2014 WL 4828189, at *1 (D.N.J. Sept. 29, 2014); Thompson v. Nat'l Football League, No. 1:13-CV-00367, 2014 WL 1646929, at *1 (W.D. Pa. Apr. 24, 2014); Tatum v. Nat'l Football League, No. 2-13-CV-01814, 2014 WL 1652794, at *1 (W.D. Pa. Apr. 24, 2014).

apply to their claims, instead considering California, Texas, Minnesota, and New York law. Id. at *11-12. After applying the relevant state law, the court found that every state's law regarding the newsworthiness defense barred every plaintiff's publicity claims. Id. at *12-15. The court also concluded that every state's law regarding consent barred the plaintiffs' publicity claims. Id. at *15-16. Similarly, the court held that the "NFL's valid copyright in the game footage forecloses Plaintiffs' publicity claims." Id. at *17.[7] Finally, the court concluded that the plaintiffs' Lanham Act claims failed because the NFL Films' videos were not commercial speech, and even if they were, the use of plaintiffs' likenesses were in no way false or misleading. Id. at *18. In summary, the district court rejected every single one of the plaintiffs' claims under every state law and under every single theory and defense. While the merits of the order granting summary judgment are not before us in this appeal,[8] the district court's order is nevertheless strong evidence that it meant what it said in its order approving the settlement regarding the likelihood of success on the merits.

The district court carefully and thoughtfully considered the strength of the plaintiffs' case and all of the potential risks they would face by continuing to litigate. Since the district court would have been the one to decide the issues, though it did not have the benefit of full briefing on all issues at the time and could have changed its mind, it was in the best position to forecast the likely outcome on the issues that would come before it. Its decision is entitled to deference.

---

[7]We note that we recently affirmed the dismissal of a plaintiff's publicity rights claims on the basis that they were preempted by the Copyright Act. See Ray v. ESPN, Inc., No. 14-2117, 2015 WL 1810486, at *3 (8th Cir. Apr. 22, 2015) (holding that "Ray's likenesses could not be detached from the copyrighted performances that were contained in the films").

[8]The merits of the order are presently before us in a separate appeal. See No. 14-3428. Nothing in our analysis here should be taken as an indication of how the merits of the issues will ultimately be decided.

## 2 - Value of the Settlement Terms to the Class

Appellants first argue that the district court could not approve the settlement without a specific value for the expected amount of recovery on the class members' claims. Second, they argue the settlement offers insufficient value to the class. We address each argument in turn.

With respect to the first argument, the Ninth Circuit rejected this exact argument in Lane: "we reject Objectors' argument insofar as it stands for the proposition that the district court was required to find a specific monetary value corresponding to each of the plaintiff class's statutory claims and compare the value of those claims to the proffered settlement award." Lane, 696 F.3d at 823. The court reasoned that while the district court carries an obligation to evaluate the strength of the plaintiffs' case relative to the risks of continued litigation, "it need not include in its approval order a specific finding of fact as to the potential recovery for each of the plaintiffs' causes of action." Id. Such a requirement would "often be impossible." Id. Thus, the district court's obligation was to evaluate "the plaintiffs' *case* in its entirety rather than on a claim-by-claim basis." Id.

Appellants argue, and some courts have called for, a more detailed evaluation of the value of class claims. For example, one of the factors adopted in other circuits in evaluating the fairness, reasonableness, and adequacy of a class settlement is "the range of reasonableness of the settlement fund in light of the best possible recovery." Girsh v. Jepson, 521 F.2d 153, 157 (3d Cir. 1975) (quoting City of Detroit v. Grinnell Corp., 495 F.2d 448, 463 (2d. Cir. 1974)). But this is not a required finding in this Circuit. Similarly, the Seventh Circuit has criticized district courts' failure to adequately valuate the potential of the plaintiffs' claims: "the judge should have made a greater effort (he made none) to quantify the net expected value of continued litigation to the class . . . . Determining that value would require estimating the range of possible outcomes and ascribing a probability to each point on the range."

Reynolds v. Beneficial Nat'l Bank, 288 F.3d 277, 284-85 (7th Cir. 2002). However, the Seventh Circuit also acknowledged that "[a] high degree of precision cannot be expected in valuing a litigation, especially regarding the estimation of the probability of particular outcomes." Id. at 285. The court suggested, as an example, that "the judge could have insisted that the parties present evidence that would enable four possible outcomes to be estimated: call them high, medium, low, and zero." Id. at 285. The judge could have then estimated an "approximate range of percentages, reflecting the probability of obtaining each of these outcomes in a trial (more likely a series of trials)" for each outcome to derive a "ballpark valuation." Id. The Ninth Circuit has expressly criticized such a detailed approach as a requirement. See Rodriguez v. West Publ'g Corp., 563 F.3d 948, 965 (9th Cir. 2009) (citing Seventh Circuit law and rejecting the notion that "the court should have specifically weighed the merits of the class's case against the settlement amount and quantified the expected value of fully litigating the matter"). The Third Circuit has also acknowledged that requiring a detailed and involved calculus for the expected recovery is not always possible:

> We note that in some cases, 'the traditional calculus suggested by the Manual for Complex Litigation . . . and adopted by [us] cannot be applied' [because] . . . calculating the value of the best possible recovery would have been 'exceedingly speculative' and both the structure of the settlement and the uncapped benefit [can make] it 'difficult to determine accurately the actual value of the settlement.'

In re Pet Food Prods. Liab. Litig., 629 F.3d 333, 355 n.30 (3d. Cir. 2010) (alterations in original).

Although this Court has not specifically defined how much precision a district court must use in evaluating the strength of the plaintiffs' case, we have previously explained that "in approving a settlement[,] the district court need not undertake the type of detailed investigation that trying the case would involve." Van Horn, 840

-24-

F.2d at 607. We see no need to adopt the Seventh Circuit's approach in this case. In a case such as this one, where the damages are not easily calculable, are highly speculative, and are heavily dependent on expert opinions, it would be difficult if not impossible to derive the initial high, medium, low, and zero for potential value of the claims in such an accurate way as to allow for a meaningful conclusion. In so doing, we do not mean to discourage district courts from requiring parties to provide valuations for the class claims; rather, we leave the required level of detail for such a showing in each case to the sound discretion of the district court. To require the district court to make detailed factual findings on the value of class claims in every case, even if it would ultimately find any of its findings of little value to evaluating the fairness, reasonableness, and adequacy of the settlement would run counter to this Court's guiding principle that "[t]he very purpose of compromise is to avoid the delay and expense of such a trial," Grunin, 513 F.2d at 124 (internal quotation marks omitted) and that "[t]he parties to a class action are not required to incur immense expense before settling as a means to justify that settlement." DeBoer v. Mellon Mortg. Co., 64 F.3d 1171, 1178 (8th Cir. 1995).

Here, there was some evidence in the record on the value of the claims. As part of the settlement process, the Magistrate Judge required the parties to provide a "concise summary of [their] analysis of the damages issues" and other confidential financial information. At oral argument, lead settlement counsel provided further details regarding the evidence presented to the Magistrate Judge, which included co-lead plaintiffs' counsel's calculated estimate of a range of damages based on a nine-year period from financial records produced by the NFL thus far. Because the Magistrate Judge was part of the district court, and was tasked with conducting the settlement discussions between both parties in an effort to achieve a mutually-agreeable resolution, the district court held that "[w]hen information is submitted to [him], it is submitted to this Court." Dryer, 2013 WL 5888231, at *4. Additionally, as part of their objections to the settlement, Appellants provided the declaration of Carl G. Degan, an economic damages expert. Degan explained several complex

formulas and alternatives through which he believed it would be feasible to calculate damages and also included a seven-page analysis on what he believed to be the value of the claims relative to the settlement. The information was available to the district court, and the district court was entitled to afford it whatever weight it found appropriate. Interestingly, although Degan was asked to "evaluate the proposed settlement value vis-à-vis potential damages," he failed to provide any opinion on the specific value of the class claims—he merely opined the settlement was too small. The absence of a specific value in his declaration is hardly surprising since to attempt to reach such specific value of the class claims, the parties would have needed full and complete discovery of the NFL's finances, a comprehensive review of the substantial amount of evidence with regard to each of the nearly 25,000 members, and expensive expert reports to support the conclusions reached. Requiring the parties to undergo such an elaborate and expensive process to produce what likely would have been two opposing speculative estimates far apart seems to be of little value in this case—especially considering that the process may have unraveled the potential for settlement. Taking into account that any derived expected value of the claims must be weighed against the likelihood of success on the merits, which is even more difficult to quantitatively measure in this case, reaffirms that a more specific valuation of the claims in this particular case was not required. Therefore, the district court did not err by not requiring additional expert evidence on the issue. We have more than enough of a "basis for determining that [the district court's] decision rests on 'well-reasoned conclusions' and is not 'mere boilerplate.'" In re Wireless, 396 F.3d at 933.

We also reject the argument that the settlement offers insufficient value to the class. As already noted, the settlement agreement provides for two clear and direct benefits to the class: the Licensing Agency and the payment of up to $42 million for the benefit of the class.

The Licensing Agency created by the settlement agreement is an agency which allows for one-stop shopping for those seeking to obtain the publicity rights of former

NFL players. Its purpose is to assist former players in identifying and securing business opportunities for licensing. The settling plaintiffs believe the Licensing Agency "will significantly reduce transaction costs and unlock the value of the group publicity rights of Class Members." Appellants argue the Licensing Agency does not provide much benefit because former players can license their likenesses through the NFL Alumni Association's group-licensing program. But regardless of whether *some* benefits might be duplicative, the Licensing Agency offers unique benefits such as the promised cooperation from the NFL in licensing its logos and trademarks. Thus, the Licensing Agency is a significant and direct benefit to all class members. Moreover, the precise value of the benefit from the Licensing Agency was for the district court to consider in the first instance, and the district court found it valuable: "former players will also finally have an avenue to pursue commercial interests in their own images and in their images as part of their former teams, for the first time in conjunction with the NFL's copyrights and trademarks . . . ." Dryer, 2013 WL 5888231, at *1. As the district court summarized, "should the Licensing Agency be unable to market individual and group publicity rights because of lack of market demand, then it is clear that the class did not truly suffer the damages alleged in this case." Id. at *7.

In addition to the benefits of the Licensing Agency, the class members have $42 million for their benefit. Although the money is not paid directly to any specific player and does not guarantee any specific amount to any specific player, the clearly stated purpose of the funds is to benefit the class. As the district court explained, the payout is "a boon to those thousands upon thousands of former NFL players who can now reap the collective benefit of a large financial payout to a fund organized solely for their benefit, overseen by their comrades-in-arms." Id. at *1.

While Appellants may not believe they received adequate value for what they believe their own individual claims were worth, in evaluating the strength of the plaintiffs' case and the potential value, the district court must take into account the

-27-

interests of the entire class—not merely the named plaintiffs. Thus, it must balance the claims of those with potentially substantial damages to those with potentially minimal or insignificant damages. "It is an inherent feature of the class-action device that individual class members will often claim differing amounts of damages." Lane, 696 F.3d at 824. This issue is apparent here, and the district court astutely took notice of it by explaining that one of the named plaintiffs, who "was featured in at least one NFL Films' production," stood to gain "relatively substantial" damages, assuming they were not barred by the statute of limitations or the NFL's other affirmative defenses. Dryer, 2013 WL 5888231, at *7. Conversely, "[a] member of the defensive squad for the 1986 Super Bowl runner-up New England Patriots, . . . might appear briefly in a documentary about the Super-Bowl-winning Chicago Bears, but that image would be fleeting and entitled to little, if any, compensation." Id. Thus, in reaching the settlement, some members would potentially be foregoing a larger payment than others, were they to prevail on the claims. Were such members required to entirely forgo their claims, the settlement may be unfair. But there is a well-established remedy that any class member may elect to preserve what he believes to be a claim worth more than what he may receive under the settlement—opt out. As the Lane court explained, this is "why due process requires that individual members of a class certified under Rule 23(b)(3) be given an opportunity to opt out of the settlement class to pursue their claims separately." 696 F.3d at 824. This important procedural right acknowledges the practical reality that "a class action *settlement* necessarily reflects the parties' pre-trial assessment as to the potential recovery of the entire class, with all of its class members' varying claims." Id.

Additionally, the NFL specifically reserved $13.5 million from the $42 million payment for any expenses related to opt-out litigation, expecting some individuals to opt out. The plaintiffs who opted out of the settlement could have brought their own individual or collective action against the NFL and potentially obtained the direct financial payout they allege is lacking in this settlement. In fact, three of the individuals who opted out had their claims dismissed with no recovery at all.

-28-

Appellants also argue the initial denial of preliminary approval for the NFL's concussion litigation settlement demonstrates the unreasonableness of the settlement in this case. See In re Nat'l Football League Players' Concussion Injury Litig., 961 F. Supp. 2d 708 (E.D. Pa. 2014). The concussion litigation involves different claims, subject to different risks, defenses, and likelihood of success, different class members, and different potential damages. The mere fact that the litigation involves similar parties in no way serves as a useful comparison in evaluating the reasonableness of the settlement for the claims at issue in this case.

In the district court's evaluation, this action involved dubious claims with highly speculative damages that were unlikely to be addressed in the context of class-action litigation. For the majority of the class, the current settlement provides a substantial benefit through the Licensing Agency and a payout of up to $42 million through the Common Good Entity. The district court believed the negotiated settlement is "a remarkable victory for the class as a whole." Dryer, 2013 WL 5888231, at *2. Under our deferential review, we cannot say the district court made a clear error of judgment in weighing the relevant factors. Accordingly, we do not believe the district court abused its discretion in approving the settlement. See In re Wireless, 396 F.3d at 933 ("Weighing the uncertainty of relief against the immediate benefit provided in the settlement, we conclude that the district court acted within its discretion when considering the strength of the claims and the amount of the settlement.").

III

We find that the district court properly considered the relevant factors and did not abuse its discretion in finding that the negotiated settlement agreement in this case was fair, reasonable, and adequate to the class. Therefore, we affirm.

SMITH, Circuit Judge, concurring.

I concur in the court's opinion. I write separately to emphasize that this class action settlement is not a *cy pres* distribution like the distribution in *In re BankAmerica Corp. Securities Litigation*.

"The term 'cy pres' is derived from the Norman French expression *cy pres comme possible*, which means 'as near as possible.'" *In re Baby Prods.*, 708 F.3d at 168 (footnote omitted) (quoting *Democratic Cent. Comm. v. Washington Metro. Area Transit Comm'n*, 84 F.3d 451, 455 n.1 (D.C. Cir. 1996)). The Third Circuit has described the traditional *cy pres* distribution in the class-action context as follows:

> When class actions are resolved through settlement, it may be difficult to distribute the entire settlement fund, after paying attorneys' fees and costs along with fund administration expenses, directly to its intended beneficiaries—the class members. Money may remain unclaimed if class members cannot be located, decline to file claims, have died, or the parties have overestimated the amount projected for distribution for some other reason. It may also be economically or administratively infeasible to distribute funds to class members if, for example, the cost of distributing individually to all class members exceeds the amount to be distributed. In these circumstances, courts have permitted the parties to distribute to a nonparty (or nonparties) the excess settlement funds for their next best use—a charitable purpose reasonably approximating the interests pursued by the class.

*Id*. at 168–69.

"We have approved *cy pres* distribution of unused or unclaimed class action settlement funds" in accordance with the criteria set forth "in § 3.07 of [the American Law Institute's (ALI)] published Principles of the Law of Aggregate Litigation

(2010)." *In re BankAmerica Corp. Sec. Litig.*, 775 F.3d at 1063–64. Section 3.07 provides:

"A court may approve a settlement that proposes a cy pres remedy . . . . The court must apply the following criteria in determining whether a cy pres award is appropriate:

(a) If individual class members can be identified through reasonable effort, and the distributions are sufficiently large to make individual distributions economically viable, settlement proceeds should be distributed directly to individual class members.

(b) If the settlement involves individual distributions to class members and funds remain after distributions (because some class members could not be identified or chose not to participate), the settlement should presumptively provide for further distributions to participating class members unless the amounts involved are too small to make individual distributions economically viable or other specific reasons exist that would make such further distributions impossible or unfair.

(c) If the court finds that individual distributions are not viable based upon the criteria set forth in subsections (a) and (b), the settlement may utilize a cy pres approach. The court, when feasible, should require the parties to identify a recipient whose interests reasonably approximate those being pursued by the class. If, and only if, no recipient whose interest reasonably approximate those being pursued by the class can be identified after thorough investigation and analysis, a court may approve a recipient that does not reasonably approximate the interests being pursued by the class."

*Id.* (alteration in original) (quoting ALI, Principles of the Law of Aggregate Litigation § 3.07 (2010)).

We recently "clarifi[ed] the legal principles" that govern *cy pres* distributions. *Id.* at 1064.

-31-

First, we agree[d] with the Fifth Circuit that, "Because the settlement funds are the property of the class, a *cy pres* distribution to a third party of unclaimed settlement funds is permissible '*only* when it is not feasible to make further distributions to class members' . . . . except where an additional distribution would provide a windfall to class members with *liquidated*-damages claims that were 100 percent satisfied by the initial distribution."

*Id*. (second alteration in original) (quoting *Klier*, 658 F.3d at 475 (quoting ALI § 3.07)).

"*Second*, a *cy pres* distribution is not authorized by declaring . . . that 'all class members submitting claims have been satisfied in full.'" *Id*. at 1065 (citation omitted). Third, "'[a] proposed *cy pres* distribution must meet [our standards governing *cy pres* awards] regardless of whether the award was fashioned by the settling parties or the trial court.'" *Id*. at 1066 (alterations in original) (quoting *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1040 (9th Cir. 2011)). Fourth, "unless the amount of funds to be distributed *cy pres* is de minimis, the district court should make a *cy pres* proposal publicly available and allow class members to object or suggest alternative recipients before the court selects a *cy pres* recipient." *Id*. "*Fifth*, when a district court concludes that a *cy pres* distribution is appropriate after applying the foregoing rigorous standards, such a distribution must be 'for the next best use . . . for indirect class benefit,' and 'for uses consistent with the nature of the underlying action and with the judicial function.'" *Id*. at 1067 (alteration in original) (quoting *In re Katrina Canal Breaches Litig.*, 628 F.3d 185, 196 (5th Cir. 2010)).

We applied these legal principles in *In re BankAmerica Corp. Securities Litigation* in reviewing a class action settlement that was *indisputably* a *cy pres* distribution. *See id*. at 1062. In that case, the district court ordered, over the class representative's objections, "that the balance of the NationsBank Classes settlement fund shall be distributed *cy pres* to the Legal Services of Eastern Missouri, Inc." *Id*.

(quotation and citation omitted). We reversed, agreeing with the class representative that, applying the legal principles set forth *supra*, "the district court abused its discretion in ordering a *cy pres* distribution because a further distribution to the classes is feasible, and in any event [the selected charity] [was] unrelated to the classes or the litigation and [was] therefore an inappropriate 'next best' *cy pres* recipient." *Id*. at 1062 (footnote omitted).

Our threshold question is whether the proposed settlement is a *cy pres* distribution at all. I conclude that it is not. In *cy pres* distributions, settlement funds are distributed to nonparties. Here, the Common Good Fund must be used to provide benefits to class members, rather than being given to nonparties unrelated to the litigation. And, the Common Good Fund and Common Good Entity are governed by a Board of Directors that *includes class members*. Furthermore, this case does not concern "unused or unclaimed class action settlement funds." *Id*. at 1064. In fact, unused funds will *never* exist here because if the Common Good Entity does not timely distribute the settlement funds, the NFL must do it. Finally, this case is distinguishable from *In re BankAmerica Corp. Securities Litigation* because, in that case, we had to determine how to handle leftover funds in a cash settlement; here, the question is whether a settlement must provide direct cash payments at all. Accordingly, *In re BankAmerica Corp. Securities Litigation* does not control the disposition of the current appeal.

_____