# United States Court of Appeals
## For the Eighth Circuit

_____

No. 16-3159

_____

Alexia Keil; Nick Hutchison; Jason Davis, individually and on behalf of all others similarly situated; Rachael D. Stone; Maja Mackenzie; Brian Andacky; Melissa Baggett; David Delre; Christopher Renna; Kimberly Lemon; Joshua Teperson; Jonathon Fisher; Cindi Inman; Beth Cox; Victoria Lyman; Stephanie Douglas; Sarah Jacobs, on behalf of herself and others similarly situated

*Plaintiffs - Appellees*

Blue Buffalo Company, Ltd.

*Defendant - Appellee*

v.

Paul Lopez

*Objector - Appellant*

_____

No. 16-3164

_____

Alexia Keil; Nick Hutchison; Jason Davis, individually and on behalf of all others similarly situated; Rachael D. Stone; Maja Mackenzie; Brian Andacky; Melissa Baggett; David Delre; Christopher Renna; Kimberly Lemon; Joshua Teperson; Jonathon Fisher; Cindi Inman; Beth Cox; Victoria Lyman; Stephanie Douglas; Sarah Jacobs, on behalf of herself and others similarly situated

*Plaintiffs - Appellees*

Blue Buffalo Company, Ltd.

*Defendant - Appellee*

v.

Pamela McCoy

*Objector - Appellant*

_____

No. 16-3167

_____

Alexia Keil; Nick Hutchison; Jason Davis, individually and on behalf of all others similarly situated; Rachael D. Stone; Maja Mackenzie; Brian Andacky; Melissa Baggett; David Delre; Christopher Renna; Kimberly Lemon; Joshua Teperson; Jonathon Fisher; Cindi Inman; Beth Cox; Victoria Lyman; Stephanie Douglas; Sarah Jacobs, on behalf of herself and others similarly situated

*Plaintiffs - Appellees*

Blue Buffalo Company, Ltd.

*Defendant - Appellee*

v.

Caroline Nadola

*Objector - Appellant*

_____

No. 16-3169

_____

-2-

Alexia Keil; Nick Hutchison; Jason Davis, individually and on behalf of all others similarly situated; Rachael D. Stone; Maja Mackenzie; Brian Andacky; Melissa Baggett; David Delre; Christopher Renna; Kimberly Lemon; Joshua Teperson; Jonathon Fisher; Cindi Inman; Beth Cox; Victoria Lyman; Stephanie Douglas; Sarah Jacobs, on behalf of herself and others similarly situated

*Plaintiffs - Appellees*

Blue Buffalo Company, Ltd.

*Defendant - Appellee*

v.

Gary W. Sibley

*Objector - Appellant*

—————————

Appeals from United States District Court
for the Eastern District of Missouri - St. Louis

—————————

Submitted: April 5, 2017
Filed: July 5, 2017

—————————

Before GRUENDER, MURPHY, and KELLY, Circuit Judges.

—————————

GRUENDER, Circuit Judge.

Paul Lopez, Pamela McCoy, Caroline Nadola, and Gary Sibley ("objectors") appeal the district court's[1] orders approving a class action settlement and awarding attorneys' fees. They raise various objections regarding the adequacy of the district court's explanation, the fairness of the settlement, the reasonableness of the attorneys' fees, and the district court's scheduling orders. For the following reasons, we affirm.

## I. BACKGROUND

Blue Buffalo Company, Ltd. ("Blue Buffalo") is a manufacturer of pet foods. In January 2015, plaintiffs brought this class action challenging Blue Buffalo's representations about the ingredients in its pet foods. Plaintiffs alleged that Blue Buffalo broke its "True Blue Promise" that its products contained no chicken or poultry by-product meals. As a result, they asserted (1) violations of the Magnuson-Moss Warranty Act ("MMWA"); (2) breach of express and implied warranties; (3) unjust enrichment; and (4) violations of the consumer protection acts of eight states: Missouri, New York, California, New Jersey, Illinois, Florida, Ohio, and Massachusetts. The MMWA, warranty, and unjust-enrichment claims were brought on behalf of a proposed nationwide class, whereas the consumer protection claims were brought on behalf of eight proposed subclasses. Class counsel estimated that the potential class size consisted of 3.5 million households.

Initially, Blue Buffalo denied all of the material allegations. However, Blue Buffalo subsequently discovered that some of its suppliers had sent mislabeled ingredients to manufacturing facilities that produced certain Blue Buffalo products. Blue Buffalo continued to deny liability, but it filed a third-party complaint against two of its suppliers in June 2015, seeking indemnification and contribution in the event it was found liable.

---

[1]The Honorable Rodney W. Sippel, Chief Judge, United States District Court for the Eastern District of Missouri.

In October 2015, class counsel and Blue Buffalo began to engage in settlement talks with a mediator. Less than two months later, the parties reached a settlement agreement. According to the settlement agreement, Blue Buffalo agreed to pay $32 million into a settlement fund. From this amount, class counsel would request $8 million for attorneys' fees and expenses, the settlement administrator would request $1.4 million to cover administrative costs, and the remaining $22.6 million would be available to pay class members. To receive a portion of this amount, class members would have two options. Under option 1, class members without pet-food receipts would receive $5 for every $50 of purchases they made, and they could claim up to $100 of eligible purchases. Under option 2, class members with receipts would receive the same $5 for every $50 of purchases, but they could claim up to $2000 in eligible purchases. Thus, the anticipated maximum recovery was $10 for option 1 members and $200 for option 2 members. However, the payment amounts were subject to a *pro rata* adjustment to ensure that all available funds would be distributed to class members who submitted claims. No amount of the fund would revert to Blue Buffalo, and a *cy pres* recipient would receive funds remaining only from uncleared checks. In addition to monetary relief, the agreement would provide injunctive relief: Blue Buffalo would ensure that it no longer represents that its products do not contain chicken or poultry by-product meal until it has reviewed its supplier relationships and has instituted practices designed to ensure that all ingredients provided by its suppliers are consistent with its packaging claims.

On December 18, 2015, the district court conditionally certified the class and preliminarily approved both the settlement and a proposed notice plan. The court set April 14, 2016 as the deadline for both claims and objections from class members, set May 12, 2016 as the deadline for class counsel's motion for attorneys' fees, and set a fairness hearing for May 19, 2016. The court also approved Heffler Claims Group ("HCG") as settlement administrator.

Using information gathered from Blue Buffalo's rewards program, HCG sent direct notice by e-mail or postcard to nearly two million class members. The notices directed class members to a settlement website containing more information and a claim form. HCG also directed potential class members to the settlement website though an advertisement in *People* magazine, online advertisements, and a press release. The direct notices and settlement website explained how to receive funds under options 1 and 2 and mentioned the possibility of a *pro rata* increase in the amount received. They further informed class members that class counsel would request attorneys' fees of no more than $8,000,000. HCG estimated that the notice program as a whole had reached more than 87 percent of the class members.

Shortly before the fairness hearing, HCG informed the district court that, as of May 9, 2016, it had received 105,173 claims from class members. This number represented only about 3 percent of the class, and the total amount of valid claimed purchases was $20,228,797.98. Because $22,600,000 was expected to be available to pay these claims, claimants would not be limited to the originally anticipated maximum recovery. Rather, claimants who submitted a valid claim form would receive the full amount of their claimed purchases, plus a *pro rata* increase of approximately 11 percent over the claimed purchase amount. For example, a class member who submitted a valid claim for $100 of purchases under option 1 would receive $111 instead of the originally anticipated maximum payment of $10. Likewise, a class member who submitted a valid claim for $2000 of purchases under option 2 would receive $2,220 instead of the originally anticipated maximum payment of $200. This process would exhaust the anticipated $22,600,000 available to pay class members.

Fourteen class members submitted written objections to the settlement by the April 14 deadline. Eight of them also objected to class counsel's proposed fee. On May 12, class counsel submitted their motion requesting $8,000,000 in attorneys' fees and expenses. In their memorandum in support of the motion, class counsel

explained why they were entitled to such a fee, and they provided information regarding the work they performed and their hourly rates. On May 18, one day before the fairness hearing, one objector, Gary Sibley, filed a supplemental objection alleging that the district court erred by not requiring class counsel to file the motion until after the deadline for class members to submit written objections had passed.

The district court held the fairness hearing on May 19, 2016. During the hearing, the court announced that it was approving the settlement, awarding attorneys' fees, and overruling all objections. The court later issued two written orders. The first order certified the settlement class, approved the settlement, and approved the payment of $1,400,000 in administrative expenses to HCG. When approving the settlement, the court stated that "[t]he factors identified in this circuit for assessing fairness of the Settlement have all been considered," but it did not expressly discuss each factor. The second order awarded attorneys' fees and expenses in the amount requested by class counsel. Four of the objectors who submitted written objections now appeal these two orders.

## II. DISCUSSION

Objectors raise a total of six issues. Three of these issues relate to the district court's approval of the settlement. First, Lopez and McCoy argue that the district court abused its discretion by failing to explain its basis for approving the settlement. Second, Lopez and McCoy argue that the relevant factors weigh against approving the settlement. Third, Nadola argues that the court erred by approving a settlement that provides everyone in the country with the opportunity to receive the same amount regardless of the consumer protection laws of the states in which they purchased Blue Buffalo products. The remaining three issues relate to the award of attorneys' fees. First, Lopez, McCoy, and Sibley argue that the amount of attorneys' fees was excessive in light of the allegedly poor outcome for the class. Second, Lopez argues that the court should not have included administrative costs as a benefit to the class

when calculating attorneys' fees. Third, Sibley argues that the court violated Federal Rule of Civil Procedure 23(h) by scheduling the deadline for class members to submit written objections on a date before the deadline for class counsel to file their motion for attorneys' fees. We address each of these arguments in turn.

## A. Settlement Approval

We review a district court's order approving a class action settlement for abuse of discretion. *Marshall v. Nat'l Football League*, 787 F.3d 502, 508 (8th Cir. 2015). "The court's role in reviewing a negotiated class settlement is . . . to ensure that the agreement is not the product of fraud or collusion and that, taken as a whole, it is fair, adequate, and reasonable to all concerned." *Id.* at 509 (quotations omitted). Objectors do not contend that the settlement agreement is the product of fraud or collusion. Rather, they argue that it is not fair, reasonable, and adequate. To determine whether a settlement is "fair, reasonable, and adequate," district courts must analyze the four factors from *Van Horn v. Trickey*: "[(1)] the merits of the plaintiff's case, weighed against the terms of the settlement; [(2)] the defendant's financial condition; [(3)] the complexity and expense of further litigation; and [(4)] the amount of opposition to the settlement." 840 F.2d 604, 607 (8th Cir. 1988). On appeal, "we ask whether the District Court considered all relevant factors, whether it was significantly influenced by an irrelevant factor, and whether in weighing the factors it committed a clear error of judgment." *Marshall*, 787 F.3d at 508 (citation and alternations omitted).

### 1. District Court's Explanation of Its Decision

Lopez and McCoy first argue that the district court abused its discretion because its final order approving the settlement contained no analysis of two of the *Van Horn* factors. On this basis alone, they ask that we vacate the district court's order and remand for reconsideration. Indeed, as we noted in *Van Horn*, "Although

in approving a settlement the district court need not undertake the type of detailed investigation that trying the case would involve, it must nevertheless provide the appellate court with a basis for determining that its decision rests on well-reasoned conclusions and not mere boilerplate." 840 F.2d at 607 (citations and quotations omitted). However, we also explained that "if the record contains facts supporting the district court's approval of the settlement, a reviewing court would be properly reluctant to attack that action solely because the court failed adequately to set forth its reasons or the evidence on which they were based." *Id.* (quotations omitted).

In *Van Horn*, the district court "summarily concluded, in a three-page opinion, that . . . '[t]he Court has carefully reviewed the written analysis made by the experts and agrees with those experts that the proposed consent decree does provide sufficient framework for the resolution of the complaints made by the class of plaintiffs.'" *Id.* (alterations in original). We observed that "[t]his analysis fails to address sufficiently the [necessary] factors" and stated that "[t]he district court's unexplained failure to follow the clearly expressed procedural law of this circuit gives us some concern." *Id.* Nevertheless, we affirmed the district court's order approving the settlement because the record contained facts demonstrating that the settlement provided "substantial benefits to the class" and thus was "fair, reasonable, and adequate." *Id.* at 607-08 (citation omitted). We also followed this approach in *In re Flight Transportation Corp. Securities Litigation*, in which we affirmed the approval of a settlement agreement despite the lack of an explanation by the district court because "the record reflect[ed] that the District Court had before it the information necessary to consider the fairness of the [settlement agreement]." 730 F.2d 1128, 1136 (8th Cir. 1984).

Lopez responds that we should no longer follow this approach. Rather, he asserts that we should follow the approach taken in a recent class-certification case, *In re Target Corp. Customer Data Security Breach Litigation*, 847 F.3d 608 (8th Cir. 2017). There, we remanded the case solely because "the district court failed to

articulate its analysis of the numerous disputed issues of law and fact regarding the propriety of class certification." *Id.* at 615. Lopez acknowledges that the instant case involves settlement approval rather than class certification but maintains that this distinction does not warrant a different approach.

On the contrary, this distinction fully explains the less forgiving approach applied in the class-certification context. Specifically, "[a] district court may not certify a class until it 'is satisfied, after a rigorous analysis,' that Rule 23(a)'s certification prerequisites are met." *Id.* at 612 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011)). As we noted in *Target*, "[t]hough the Supreme Court has not articulated what, specifically, a 'rigorous analysis' of class certification prerequisites entails, at a minimum the rule requires a district court to state its reasons for certification in terms specific enough for meaningful appellate review." *Id.* Hence, a court's failure to state its reasons for class certification constitutes a failure to conduct the "rigorous analysis" specific to class certification. *See id.* The same "rigorous analysis" standard simply does not apply to settlement approvals, and so we will not remand solely on the basis of an inadequate explanation.

That said, we cannot disagree with Lopez's contention that the district court failed to discuss two of the *Van Horn* factors adequately. Other courts tend to list the factors and proceed systematically to analyze each one, devoting at least one paragraph to each factor. *See, e.g.*, *Huyer v. Wells Fargo & Co.*, 314 F.R.D. 621, 626-28 (S.D. Iowa 2016); *Khoday v. Symantec Corp.*, No. 11-cv-180, 2016 WL 1637039, at *5-6 (D. Minn. April 5, 2016). Here, in contrast, the district court simply asserted that "[t]he factors identified in this circuit for assessing fairness of the Settlement have all been considered." To be sure, in the same paragraph, the court briefly discussed Blue Buffalo's financial condition and the amount of opposition to the settlement. However, it provided no analysis of the other two factors: the merits of the plaintiff's case weighed against the terms of the settlement; and the complexity and expense of further litigation. Although the court may have alluded to these two

-10-

factors later in the order when it stated that "[t]he relief obtained here, when weighed against the complexities and uncertainties of the litigation and the certainty of lengthy litigation in the absence of a settlement, support the Settlement, which avoids significant risk and delay and affords meaningful relief to Settlement Class Members," it did not explain how it made this evaluation. Rather, "[t]hese remarks are conclusions, not reasons." *See Target*, 847 F.3d at 612.

Thus, as in *Van Horn*, "[t]he district court's unexplained failure to follow the clearly expressed procedural law of this circuit gives us some concern." *See* 840 F.2d at 607. Nevertheless, "the record reflects that the District Court had before it the information necessary to consider the fairness of the [settlement agreement]," and thus "we shall review the District Court's action on the basis of the record before us." *See Flight Transp. Corp.*, 730 F.2d at 1136. As explained below, we find sufficient facts in the record to conclude that the settlement in this case is fair, reasonable, and adequate.

### 2. *Analysis of the* Van Horn *Factors*

To determine whether the settlement is fair, reasonable, and adequate, we analyze each of the four mandatory factors: (1) the merits of the plaintiff's case weighed against the terms of the settlement; (2) the defendant's financial condition; (3) the complexity and expense of further litigation; and (4) the amount of opposition to the settlement. *Van Horn*, 840 F.2d at 607. The first factor, "a balancing of the strength of the plaintiff's case against the terms of the settlement," is "[t]he single most important factor." *Id.*

### i. Merits of the Plaintiffs' Case Weighed Against the Terms of the Settlement

The first factor weighs in favor of approving the settlement because "the outcome of the litigation would be far from certain" if the case had not settled, *In re*

*Wireless Tel. Fed. Cost Recovery Fees Litig.*, 396 F.3d 922, 933 (8th Cir. 2005) (quotation omitted), whereas "the settlement provides substantial benefits to the class," *Van Horn*, 840 F.2d at 608 (quotation omitted). Lopez contends that the merits of the plaintiffs' case were strong because Blue Buffalo admitted that suppliers sent mislabeled ingredients to manufacturing facilities that produced certain Blue Buffalo products. However, this admission does not mean that plaintiffs had a strong chance of prevailing on the merits. Blue Buffalo continued to deny knowledge and liability, and it maintained nine affirmative defenses. Moreover, Blue Buffalo admitted that the mislabeled ingredients affected only a portion of its products—not all of them. As a result, it is possible that only a small fraction of the pet food purchased by class members contained by-product meals, with no way to discover which class members were affected. This possibility would have harmed class members' chances of prevailing on the merits. *Cf. O'Neil v. Simplicity, Inc.*, 574 F.3d 501, 503 (8th Cir. 2009) ("It is not enough to [prove] that a product line contains a defect or that a product is at risk for manufacturing this defect; rather, the plaintiffs must [prove] that their [unit of] product actually exhibited the alleged defect.").

Furthermore, although the district court certified the class for purposes of settlement, it is uncertain whether, if the case proceeded to trial, this multistate class of consumers would have created "intractable management problems" requiring the district court to decertify it. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997) ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems . . . ."); *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 537 (3d Cir. 2004) (finding that "a multistate class of consumers and [third-party payors]" created "a significant risk that such a class would create intractable management problems if it were to become a litigation class and therefore be decertified," and that this risk weighed in favor of approving a settlement). In sum, the outcome of the litigation was far from certain.

-12-

On the other side of the ledger, the settlement confers substantial and immediate benefits on the class. Blue Buffalo paid $32,000,000 into the settlement fund. After deducting attorneys' fees and administrative costs, $22,600,000 is available to pay class members. Unlike other consumer class action settlements, class members will receive cash instead of coupons, which often are not worth their face value to the recipients. *See Redman v. RadioShack Corp.*, 768 F.3d 622, 630 (7th Cir. 2014) ("83,000 $10 coupons are not worth $830,000 to the recipients. Anyone who buys an item at RadioShack that costs less than $10 will lose part of the value of the coupon because he won't be entitled to change. Anyone who stacks three coupons to buy an item that costs $25 will lose $5.").

Lopez complains that the settlement provides a "modest recovery" compared to class counsel's estimate of $150,000,000 in potential compensatory damages that the class could recover at trial, which class counsel included in their motion for final approval of the settlement. However, Lopez ignores the fact that class counsel stated that this estimate represented a "best-case scenario." As explained above, there were substantial risks as to whether class counsel could successfully certify and maintain a class, let alone prevail at trial and recover the full measure of damages they sought. Moreover, class counsel provided an economic analysis showing that $150,000,000 discounted to present value yielded a damages figure of $115,000,000 and that the $32,000,000 settlement fund thus represented 27 percent of the present value of the maximum possible full verdict at trial. As courts routinely recognize, "a settlement is a product of compromise and the fact that a settlement provides only a portion of the potential recovery does not make such settlement unfair, unreasonable or inadequate." *In re BankAmerica Corp. Sec. Litig.*, 210 F.R.D. 694, 708 (E.D. Mo. 2002); *see also City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 455 n.2 (2d Cir. 1974) ("In fact there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery."), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 49-50 (2d Cir. 2000). And this amount, representing 27 percent of

the maximum recovery at trial, is a compromise well within the fair and reasonable range. *See, e.g.*, *Wells Fargo & Co.*, 314 F.R.D. at 626-28 (approving $25,750,000 class action settlement when class counsel estimated that class members had incurred actual damages of over $100,000,000), *aff'd sub. nom. Huyer v. Njema*, 847 F.3d 934, 939-40 (8th Cir. 2017).

Moreover, because of the low claims rate, those class members who submitted valid claims will receive more than 100 percent of the amount they claimed that they spent on Blue Buffalo products during the relevant time period. This is certainly a substantial benefit. *See Njema*, 847 F.3d at 939 (holding that district court did not err in concluding that first factor weighed in favor of settlement where "every class member who receives an award will receive at least $5 to compensate for an average inspection fee cost of $15"). Although Lopez points out that the low claims rate also means that only 3 percent of the class will receive this benefit, we note that a claim rate as low as 3 percent is hardly unusual in consumer class actions and does not suggest unfairness. *See, e.g.*, *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 329 n.60 (3d Cir. 2011) (citing evidence suggesting that "consumer claim filing rates rarely exceed seven percent, even with the most extensive notice campaigns"); *Perez v. Asurion Corp.*, 501 F. Supp. 2d 1360, 1377-78, 1384 (S.D. Fla. 2007) (approving settlement where 118,663 out of approximately 10.3 million class members submitted claims, for a claim rate of approximately 1.2 percent). Moreover, even if 97 percent of the class did not exercise their right to share in the fund, their opportunity to do so was a benefit to them. *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 480 (1980) ("Their right to share the harvest of the lawsuit upon proof of their identity, whether or not they exercise it, is a benefit in the fund created by the efforts of the class representatives and their counsel."). Further, assuming that these class members continue to purchase pet food, they will benefit from the additional injunctive relief that the settlement provides. *See Bezdek v. Vibram USA, Inc.*, 809 F.3d 78, 84 (1st Cir. 2015) ("The district court did not abuse its discretion in concluding that

injunctive relief against continuation of the allegedly false advertising was 'a valuable contribution to this settlement agreement.'").

Nevertheless, Lopez contends that informing class members that they "could only recover $10 unless they could locate old pet food receipts . . . discouraged claims to an unreasonable degree." However, requiring proofs of purchase is a valid technique for preventing fraudulent claims. *See Mullins v. Direct Digital, LLC*, 795 F.3d 654, 667 (7th Cir. 2015) (recognizing that courts may rely on "techniques tailored by the parties" to mitigate the risk of "mistaken or fraudulent claims"). Hence, settlements in false-advertising cases often provide enhanced recovery for those with proofs of purchase. *See, e.g., Bezdek*, 809 F.3d at 81, 83-84 (affirming approval of settlement in which "[c]lass members seeking a refund for more than two pairs of shoes would be required to submit a Claim Form plus proof of purchase"). In fact, for many class members hoping to submit claims under option 2, locating proofs of purchase would not have been an onerous burden: in the past three years, 70-75 percent of the products at issue were sold through retailers with loyalty programs that maintain purchase records, and the settlement website provided information on how to obtain these purchase records. And, contrary to Lopez's suggestion, class members were informed of the possibility of recovering more than $10 even without submitting receipts, as the notices and settlement website explained the possibility of a *pro rata* increase of the recovery amounts.

In sum, the settlement provides substantial and immediate benefits to the class. Thus, "[w]eighing the uncertainty of relief against the immediate benefit provided in the settlement," *In re Wireless*, 396 F.3d at 933, we conclude that this factor weighs in favor of approving the settlement.

*ii. Defendant's Financial Condition*

As the district court noted, "[t]here is no evidence in the record calling Blue Buffalo's financial condition into question, and indeed, Blue Buffalo has already deposited $32 million into the Settlement Fund." As such, this factor is neutral. *See Marshall*, 787 F.3d at 512 (finding this factor neutral where defendant was "in good financial standing, which would permit it to adequately pay for its settlement obligations or continue with a spirited defense in the litigation").

*iii. Complexity and Expense of Further Litigation*

"Class actions, in general, place an enormous burden of costs and expense upon parties." *Id.* (quotations and alterations omitted). Here, "the application of numerous states' laws" made this a particularly complex case. *See id.* The fact that Blue Buffalo filed a third-party complaint against two suppliers further contributed to the complexity. In addition, class counsel described the complexity and expense of further litigation to the district court as follows:

> Blue Buffalo has alleged numerous legal and factual defenses that, absent settlement, will require full discovery, including numerous depositions, briefing, and additional pre-trial work. Class certification, expert discovery, and summary judgment motions are just a few of the matters that would ensue, in addition to a trial and possible appeals. Additional work may also include pre-trial motions, post-trial motions, and thousands more hours of attorney time.

Class counsel's views are entitled to deference, especially since the district court found that they have significant experience in class actions and complex litigation. *See DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1178 (8th Cir. 1995). As such, this factor weighs in favor of settlement approval.

*iv. Amount of Opposition to the Settlement*

As the district court noted, "[w]hile there have been objections, they are small in number, which speaks well of class reaction to the Settlement." Specifically, out of a class of approximately 3.5 million households, with an estimated 87 percent receiving notice, class members submitted 105,173 claims, whereas only fourteen class members submitted timely objections. Moreover, none of the named plaintiffs objected to the settlement. Thus, the amount of opposition is minuscule when compared with other settlements that we have approved. *See Marshall*, 787 F.3d at 513 ("We have previously approved class-action settlements even when almost half the class objected to it. We have approved a class-action settlement even when all named plaintiffs opposed it." (citations omitted)); *DeBoer*, 64 F.3d at 1174, 1178 (holding that "[t]he fact that only a handful of class members objected to the settlement similarly weighs in its favor" where five class members objected out of a class of 300,000). As such, this factor likewise weighs in favor of approving the settlement.

To summarize, three factors weigh in favor of approval and one is neutral. However, before concluding that the settlement is fair, reasonable, and adequate, we address Nadola's separate objection regarding state-law claims.

*3. State-Law Claims*

Nadola claims that the district court abused its discretion in approving the settlement because the settlement's allocation plan distributes the fund equally among class members of all states, without accounting for the varying strengths of different states' unfair trade practice statutes. Essentially, she argues that residents of states with strong consumer protection laws should receive greater benefits under the settlement because they would have recovered more money than residents of states with weaker consumer protection laws. For this reason, she contends that the terms

-17-

of the settlement are inherently unfair. She also argues that the district court abused its discretion by not considering any evidence regarding the valuation of claims under the laws of different states before approving the settlement.

As an initial matter, class counsel assert that Nadola lacks standing to make this argument because she is not injured by the aspect of the settlement that she challenges. Specifically, they contend that she has failed to show that her own state-law claims would be stronger than the claims of other class members under other states' laws. Because "[f]ederal courts must address questions of standing before addressing the merits of a case where standing is called into question," *Brown v. Medtronic, Inc.*, 628 F.3d 451, 455 (8th Cir. 2010), we first address whether Nadola has standing to maintain her claim.

"To show standing under Article III of the U.S. Constitution, a plaintiff must demonstrate (1) injury in fact, (2) a causal connection between that injury and the challenged conduct, and (3) the likelihood that a favorable decision by the court will redress the alleged injury." *Iowa League of Cities v. EPA*, 711 F.3d 844, 869 (8th Cir. 2013). "The standing Article III requires must be met by persons seeking appellate review, just as it must be met by persons appearing in courts of first instance." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 64 (1997).

Nadola first responds that she has standing because of the Supreme Court's decision in *Devlin v. Scardelletti*, which stated that "[a]s a member of the . . . class, petitioner has an interest in the settlement that creates a 'case or controversy' sufficient to satisfy the constitutional requirements of injury, causation, and redressability." 536 U.S. 1, 6-7 (2002) (citations omitted). However, we recently rejected this argument in *Huyer v. Van de Voorde*, 847 F.3d 983 (8th Cir. 2017). There, we explained that "the Court expressly noted that the issue in *Devlin* did 'not implicate the jurisdiction of the courts under Article III of the Constitution.'" *Id.* at 986 (quoting *Devlin*, 536 U.S. at 6). Thus, notwithstanding any dicta in *Devlin*, we

held that a class member appealing a settlement "still must show that she satisfies the standing requirements of Article III." *Id.*

We further held that the class member in *Van de Voorde*, by objecting to the adverse treatment of a subclass to which she did not belong, failed to show that she suffered an injury in fact. *Id.* at 986-87. In fact, because awarding more money to that subclass would diminish her own subclass's share of the fund, she "likely would receive *less* money as a result of" the changes she sought. *Id.* at 987. Thus, her lack of standing was apparent.

However, this case is quite different. Here, Nadola stated that she purchased Blue Buffalo products in New Jersey, and she points out that New Jersey permits treble damages in consumer protection actions. *See* N.J. Stat. Ann. § 56:8-19. In addition, New Jersey is one of the eight states under whose consumer protection laws plaintiffs sued, and thus Nadola would have been part of the New Jersey subclass in addition to the nationwide class. Consequently, if the settlement agreement either adjusted recovery to account for the relative strength of all fifty states' consumer protection laws or simply provided greater recovery for class members who were also members of a subclass, Nadola presumably would receive more money. *See Rougvie v. Ascena Retail Grp., Inc.*, No. 15-724, 2016 WL 4111320, at *1, 4-5, n.5 (E.D. Pa. July 29, 2016) (approving settlement agreement that grouped consumers from all fifty states into three categories according to the type of recovery generally permitted under the relevant state statutes, and noting that class members in "treble recovery states" would receive more than class members in "single recovery states" or "limited recovery states"); *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 272-73 (3d Cir. 2009) (approving settlement that designated greater percentage of settlement value to members who purchased excess insurance policies than those who purchased only non-excess policies). Thus, we are persuaded that Nadola has demonstrated (1) an injury in fact (2) caused by the settlement's failure to account for differences in state law and (3) which we can redress through a favorable decision. *See Iowa League of*

-19-

*Cities*, 711 F.3d at 869. As such, unlike in *Van de Voorde*, Nadola has standing to raise this issue on appeal.

Nevertheless, we reject Nadola's argument on the merits. None of the decisions that she cites stand for the proposition that settlement agreements *must* account for differences in state law—each one simply approved such an agreement negotiated by the parties. *E.g.*, *Rougvie*, 2016 WL 4111320, at *1, 4-5; *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, No. 1532, 2011 WL 1398485, at *1, 6 (D. Me. Apr. 13, 2011). Indeed, "[i]t is an inherent feature of the class-action device that individual class members will often claim differing amounts of damages." *Marshall*, 787 F.3d at 520 (citation omitted). This does not mean that every settlement agreement must account for such differences. Rather, "a class action settlement necessarily reflects the parties' pre-trial assessment as to the potential recovery of the entire class, with all of its class members' varying claims." *Id.* Moreover, "there is a well-established remedy that any class member may elect to preserve what he believes to be a claim worth more than what he may receive under the settlement—opt out." *Id.* Thus, the fact that the settlement agreement did not account for differences in state laws does not render it unfair.

Nor did the district court abuse its discretion by not considering evidence regarding the valuation of claims under the laws of different states. Nadola objects to the district court's statement that "[t]he objections that raise individual state law claims are not well taken as the Settlement is evaluated in its entirety, rather than on a claim by claim basis." But the district court was correct. Its "obligation was to evaluate the plaintiffs' case in its entirety rather than on a claim-by-claim basis." *Id.* at 517 (quotations omitted). This case involved three federal claims in addition to the state-law claims. Hence, the state-law claims were only a fraction of the overall case. Moreover, the settlement provided all class members with the opportunity to receive up to $2220 and afforded injunctive relief to all class members. It was not an abuse

of discretion to find that a settlement providing such benefits was fair to all class members, including those who may have had additional state-law claims.

Therefore, in light of the above analysis, we conclude that the settlement was fair, reasonable, and adequate, and we affirm the district court's order approving the settlement.

## B. Attorneys' Fees

"Decisions of the district court regarding attorney fees in a class action settlement will generally be set aside only upon a showing that the action amounted to an abuse of discretion." *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1156 (8th Cir. 1999). However, "[w]e review *de novo* [any] legal issues related to the award of attorney's fees and costs." *Sturgill v. United Parcel Service, Inc.*, 512 F.3d 1024, 1036 (8th Cir. 2008) (citation omitted).

### 1. Reasonableness

"Courts utilize two main approaches to analyzing a request for attorney fees." *Johnston v. Comerica Mortg. Corp.*, 83 F.3d 241, 244 (8th Cir. 1996). "Under the 'lodestar' methodology, the hours expended by an attorney are multiplied by a reasonable hourly rate of compensation so as to produce a fee amount which can be adjusted, up or down, to reflect the individualized characteristics of a given action." *Id.* "Another method, the 'percentage of the benefit' approach, permits an award of fees that is equal to some fraction of the common fund that the attorneys were successful in gathering during the course of the litigation." *Id.* at 244-45. "It is within the discretion of the district court to choose which method to apply, as well as to determine the resulting amount that constitutes a reasonable award of attorney's fees in a given case." *In re Life Time Fitness, Inc., Tel. Consumer Prot. Act (TCPA) Litig.*, 847 F.3d 619, 622 (8th Cir. 2017) (quotations and citations omitted). To

determine the reasonableness of a fee award under either approach, district courts may consider relevant factors from the twelve factors listed in *Johnson v. Georgia Highway Express*, 488 F.2d 714, 719-20 (5th Cir. 1974). *See Buckley*, 849 F.3d at 399 (approving district court's reliance on *Johnson* factors when awarding fee based on percentage-of-benefit method); *Marez v. Saint-Gobain Containers, Inc.*, 688 F.3d 958, 966 & n.4 (8th Cir. 2012) (approving reliance on *Johnson* factors when using lodestar method).

Here, the district court applied the percentage-of-the-benefit approach and awarded 25 percent of the $32,000,000 settlement fund, generating a fee award of $8,000,000. Although not required to do so, the court verified the reasonableness of its award by cross-checking it against the lodestar method. *See Petrovic*, 200 F.3d at 1157 ("[U]se of the 'lodestar' approach is sometimes warranted to double-check the result of the 'percentage of the [benefit]' method."). The court determined that the fee award corresponded to a lodestar multiplier of 2.7, that the hours and rates submitted by class counsel were reasonable, and that the multiplier was in line with multipliers used in other cases. Thus, the court approved the fee award as reasonable.

Lopez, McCoy, and Sibley argue that the district court abused its discretion because this fee was excessive in light of the results obtained. First, Lopez argues that counsel should not be rewarded with a fee that is nearly three times their lodestar when only 3 percent of class members submitted claims. In support of this argument, he cites two unpublished opinions in which district courts declined to award the requested amount of attorneys' fees because of a low claims rate. *See Eastwood v. S. Farm Bureau Cas. Ins. Co.*, No. 3:11-cv-03075, 2014 WL 4987421, at *6 (W.D. Ark. Oct. 7, 2014); *Simon v. Toshiba America*, No. 07-06202, 2010 WL 1757956, at *4 (N.D. Cal. Apr. 30, 2010). However, Lopez identifies no binding authority requiring courts to do so. Moreover, in each case he cites, the defendant retained any unclaimed benefits, reducing the total amount received by class members and justifying a lower award. *Eastwood*, 2014 WL 4987421, at *6 (finding that total

value of settlement did not include "upwards of $1,500,000.00 in the common fund [that] will revert to Defendant at the end of the day"); *Simon*, 2010 WL 1757956, at *1, *3 (recognizing "the difficulty of measuring the value of the settlement at issue in this case . . . because the claims period is not yet complete" where the settlement allowed class members to claim refunds from defendant but did not create a specified common fund). Here, there was no reversion to Blue Buffalo. Rather, class members who submitted claims received a *pro rata* increase. Thus, the low claims rate did not reduce the total amount received by the class. Furthermore, as we previously explained, a low claims rate is not unusual in a consumer class action such as this one. As such, the district court did not abuse its discretion in declining to reduce the fee award on this basis.

Second, Lopez argues that the lodestar multiplier is not in line with comparable cases. He points out that the case cited by the district court for the proposition that the multiplier of 2.7 is "in line with multipliers used in other cases" involved a securities class action. *See In re Xcel Energy, Inc., Sec., Derivative & ERISA Litig.*, 364 F. Supp.2d 980, 999 (D. Minn. 2005) (approving multiplier of 4.7 and citing other securities class action cases approving multipliers ranging from 4.3 to 6.96). Lopez argues that the district court should have compared this case to another consumer class action involving pet food, *In re Pet Food Products Liability Litigation*. *See* No. 07-2867, 2008 WL 4937632 (D. N.J. Nov. 18, 2008), *aff'd in part*, *vacated in part on other grounds*, *remanded*, 629 F.3d 333 (3d Cir. 2010). He points out that the multiplier in that case was less than 1.2. *See id.* at *23. For this reason, he argues that the district court should have reduced class counsel's fees to reflect a similar multiplier.

However, the court in *Pet Food Products* never suggested that it was using a multiplier of less than 1.2 because that was the appropriate range to use in consumer class actions. Rather, the court awarded that fee simply because it was what class counsel requested. *Id.* Moreover, under the percentage-of-the-benefit approach, the

fee represented 25 percent of the settlement fund, which is the same percentage as in this case. *Id.* This percentage is consistent with other fee awards that we have approved in other class action cases that did not involve securities. *See Caligiuri v. Symantec Corp.*, 855 F.3d 860, 865-66 (8th Cir. 2017) (affirming fee award that represented one-third of the total settlement fund in class action seeking to recover cost of download insurance services); *Buckley*, 849 F.3d at 399 (approving the same in class action seeking to recover cost of property inspection fees). Thus, we will not require the district court to reduce the fee award on the basis that the multiplier was not in line with comparable cases.

Third, McCoy suggests that "careful scrutiny of the affidavits and billing statements provided by class counsel could have yielded a significant fee reduction." However, despite the fact that class counsel submitted detailed information showing the hourly rates for each attorney, how much time they expended, and which tasks they worked on, McCoy fails to explain why this information did not support the fee requested. The district court stated that it found that "the total time expended by plaintiffs' counsel was reasonable, particularly in light of the result achieved," and McCoy offers no reason for us to doubt the district court's assessment.

Fourth, McCoy and Sibley argue that the district court failed to adequately discuss all of the *Johnson* factors and that these factors weigh against awarding the requested fee. Indeed, the court did not discuss all twelve factors but rather stated that it "reviewed all factors relevant to the award of an attorneys' fee, including the novelty and difficulty of questions presented, the contingent nature of the action and the result obtained on behalf of the Class." However, the district court was not required to discuss all of the factors, since "rarely are all of the *Johnson* factors applicable[,] [and] this is particularly so in a common fund situation." *See Uselton v. Commercial Lovelace Motor Freight, Inc.*, 9 F.3d 849, 854 (10th Cir. 1993).

Moreover, the record supports the district court's decision to award the requested fee based on the relevant factors. Class counsel represented to the district court that five factors were relevant: (1) the amount involved and the results obtained; (2) whether the fee is fixed or contingent; (3) the novelty and difficulty of the questions; (4) the experience, reputation, and ability of the attorneys; and (5) awards in similar cases. *See Johnson*, 488 F.2d at 717-19 (listing factors). We have already discussed the first, third, fourth, and fifth factors when explaining that the results obtained were beneficial to the class, further litigation would be complex and expensive, class counsel have significant experience in class actions and complex litigation, and the award is in line with awards in similar cases. The remaining factor also weighs in favor of awarding the requested fee because class counsel took this case on a contingency basis. *See Buckley*, 849 F.3d at 399. Therefore, the district court did not abuse its discretion in concluding that the fee was reasonable after reviewing all relevant factors.

### 2. Administrative Costs

Lopez and Sibley argue that the district court should have calculated attorneys' fees as a percentage of $30,600,000 rather than $32,000,000 because the $1,400,000 in administrative costs did not constitute a benefit to the class. As support, Lopez cites the Seventh Circuit's decision in *Redman v. RadioShack Corp.*, which held that "administrative costs should not have been included in calculating the division of the spoils between class counsel and class members." 768 F.3d 622, 630 (7th Cir. 2014).

However, we recently rejected the Seventh Circuit's approach and held that "the rule in this circuit is that a district court may include fund administration costs as part of the 'benefit' when calculating the percentage-of-the-benefit fee amount." *Caligiuri*, 855 F.3d at 865. Thus, "[w]e review the district court's decision for an abuse of discretion, and we ask [only] whether the appellant has made a showing that the administrative costs were unjustifiable." *Id.* (quotation omitted).

Lopez and Sibley make no showing that the administrative costs were unjustifiable. They do not, for instance, contend that the notice and administrative costs themselves were "unjustifiably high," *see id.*, or "excessive," *see Staton v. Boeing Co.*, 327 F.3d 938, 975 (9th Cir. 2003). Instead, Lopez argues that the administrative costs were unjustifiable only because the low claims rate revealed the limited benefit of the notice campaign and because inclusion of the administrative costs further contributed to an already-inflated fee. However, we have already explained that the low claims rate was not unusual and that the amount of the fee was not unreasonable. Therefore, we decline to hold that the district court abused its discretion by including administrative costs in its calculation of attorneys' fees.

*3. Opportunity to Respond to Fee Motion*

Finally, Sibley argues that the district court violated Rule 23(h) by approving attorneys' fees without providing class members with an opportunity to respond to class counsel's fee motion. "Interpreting the Federal Rules of Civil Procedure presents a question of law subject to de novo review." *Indiana Lumbermens Mut. Ins. Co. v. Timberland Pallet & Lumber Co., Inc.*, 195 F.3d 368, 374 (8th Cir. 1999) (citation and alteration omitted).

Rule 23(h) states, in relevant part:

(1) A claim for an award must be made by motion under Rule 54(d)(2), subject to the provisions of this subdivision (h), at a time the court sets. Notice of the motion must be served on all parties and, for motions by class counsel, directed to class members in a reasonable manner.

(2) A class member, or a party from whom payment is sought, may object to the motion.

-26-

Fed. R. Civ. P. 23(h). Sibley contends that the district court violated the Rule because it did not provide class members with an opportunity to "object to the motion." *Id.* 23(h)(2). This is because the notice sent to class members provided that all objections must be postmarked by April 14, 2016, whereas the deadline for class counsel to file their fee motion was May 12, 2016, and in fact, class counsel did not file their motion until that date.

Indeed, several of our sister circuits have held that this practice violates Rule 23(h). For example, in *In re Mercury Interactive Corp. Securities Litigation*, the Ninth Circuit held that "the district court abused its discretion when it erred as a matter of law by misapplying Rule 23(h) in setting the objection deadline for class members on a date before the deadline for lead counsel to file their fee motion." 618 F.3d 988, 993 (9th Cir. 2010). The Ninth Circuit reasoned that "[t]he plain text of the rule requires that any class member be allowed an opportunity to object to the fee 'motion' itself, not merely to the preliminary notice that such a motion will be filed." *Id.* at 993-94. As a result of the district court's action, the objectors "could make only generalized arguments about the size of the total fee because they were only provided with generalized information [in the preliminary notice]." *Id.* at 994. This "denie[d] the class an adequate opportunity to review and prepare objections to class counsel's completed fee motion." *Id.* at 994-95. The Seventh Circuit reached the same conclusion in *Redman*. *See* 768 F.3d at 637-38 ("Class counsel did not file the attorneys' fee motion until after the deadline set by the court for objections to the settlement had expired. That violated [Rule 23(h)]."). And the Third Circuit, in dicta, has agreed with this interpretation. *See In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 446 (3d Cir. 2016) ("We have little trouble agreeing that Rule 23(h) is violated in those circumstances [present in *Mercury* and *Redman*].").

Class counsel respond that "Rule 23 does not by its terms require that a fee motion precede the objection deadline in class settlements." Citing the advisory

committee note to Rule 23(h)(1), they contend that they need only provide "information about the motion" in the notice to class members, which they did when disclosing in the notice of proposed settlement that they would seek a fee of "not more than $8,000,000." *See* Fed. R. Civ. P. 23(h)(1) advisory committee note (2003). They also cite an unpublished Second Circuit opinion for the proposition that "the Second Circuit has rejected the per se ruling of *Mercury* and *Redman*." There, the court construed a class member's objection as "as a challenge to the reasonableness of the notice of class counsel's fee motion" under Rule 23(h)(1). *Cassese v. Williams*, 503 Fed. App'x 55, 57 (2d Cir. 2012) (unpublished). As a result, the court concluded that "notice of class counsel's fee request was reasonable here under the circumstances and sufficient to satisfy due process" because "objectors then had two weeks [after the fee motion deadline] to crystallize their objections and request further information before attending the fairness hearing." *Id.* at 58.

However, these arguments construing Rule 23(h)(1), which states that notice must be "directed to class members in a reasonable manner," have no bearing on the interpretation of Rule 23(h)(2), which states that class members "may object to the motion" and is the basis for the rule articulated in *Mercury*. *See* 618 F.3d at 993-94. Indeed, the advisory committee note to Rule 23(h)(2) states that "[i]n setting the date objections are due, the court should provide sufficient time after the full fee motion is on file to enable potential objectors to examine the motion." Fed. R. Civ. P. 23(h)(2) advisory committee note (2003). Thus, we have little difficulty in concluding that *Mercury* and *Redman* correctly interpreted Rule 23(h)(2).

Here, the district court's scheduling order likewise violated Rule 23(h)(2). Although class members were informed by the notice of proposed settlement that class counsel would request up to $8,000,000 in attorneys' fees, they "could make only generalized arguments about the size of the total fee" in their objections. *See Mercury*, 618 F.3d at 994. Indeed, class members "could not provide the court with critiques of the specific work done by counsel when they were furnished with no

information of what that work was, how much time it consumed, and whether and how it contributed to the benefit of the class" until class counsel submitted their fee motion. *See id.* at 994. Because the deadline for submitting objections had passed by the time class counsel submitted their fee motion, class members were denied an "adequate opportunity to review and prepare objections to class counsel's completed fee motion." *See id.* at 994-95. We do not purport to decide how much time after the fee motion deadline is sufficient to provide class members with an adequate opportunity to object to the motion. We hold only that the district court erred by setting the deadline for objections on a date before the deadline for class counsel to file their fee motion.

Nevertheless, "[a] reviewing court has the duty to determine whether errors alleged are harmless." *Ark. Elec. Energy Consumers v. Middle S. Energy, Inc.*, 772 F.2d 401, 404 (8th Cir. 1985). Harmless errors are those that "do not affect the substantial rights of the parties." 28 U.S.C. § 2111; *see also* Fed. R. Civ. P. 61. An error affects a party's substantial rights when it is prejudicial, "which means that there must be a reasonable probability that the error affected the outcome of the [proceeding]." *United States v. Marcus*, 560 U.S. 258, 262 (2010).

Neither *Mercury* nor *Redman* considered whether the Rule 23(h) violations at issue were harmless. Here, however, we are convinced that the error is harmless because there is no reasonable probability that it affected the outcome of the proceeding. Rather, the district court would have awarded the same fee even if the court had set the deadline for objections to be after the deadline for the fee motion.

After all, the four objectors now have had an ample opportunity on appeal to respond to the specific arguments contained within class counsel's fee motion. Despite raising a number of objections, none of their arguments are meritorious. As explained previously, the objectors' arguments do not convince us that the attorneys' fees were unreasonable. Nor do we believe that any of their arguments would have

-29-

persuaded the district court to award a lower fee. *See In re Lawnmower Horsepower Mktg. & Sales Practice Litig.*, No. 08-1999, 2010 WL 4386552, at *2 (E.D. Wis. Oct. 28, 2010) (holding that any Rule 23(h) error was harmless because there was no "reasonable probability that the scheduling error resulted in the non-assertion of an objection that would have been successful and would have resulted in class counsel receiving less in fees and costs than [was] ultimately awarded"). The court awarded the requested fee because it was in line with awards from other cases, the relevant *Johnson* factors supported it, and the hourly rates and time expended by class counsel were reasonable. None of the objectors' arguments undermine these reasons or even identify any reasonable basis for reducing the requested fee. Thus, even if class members had an opportunity to object to the fee motion, there is no reasonable probability that their objections would have resulted in the court awarding a lower fee.

Although we recognize that the district court in *Mercury* did award a lower fee after the case was remanded, that award resulted from an agreement between the parties whereby class counsel would request a lower fee and the two objectors would agree not to object to the renewed fee motion. *In re Mercury Interactive Corp. Sec. Litig.*, No. 5:05-cv-03395, 2011 WL 826797, at *1 (N.D. Cal. Mar. 3, 2011) (unpublished). However, class counsel in *Mercury* had good reason to negotiate. Specifically, the Ninth Circuit had not addressed any arguments challenging the reasonableness of the fee award before remanding based on the Rule 23(h) violation. 618 F.3d at 995 & n.3. Hence, it would have been reasonable for class counsel in *Mercury* to fear having the objectors raise potentially meritorious objections before the district court. Here, we have addressed all of the objections to the fee award and explained that they lack merit. As such, we see no reason to believe that class counsel would agree to request a lower fee on remand.

Thus, in light of the circumstances of this case, we conclude that the scheduling error was harmless. Accordingly, we affirm the court's order awarding attorneys' fees and expenses.

### III. CONCLUSION

We find that the settlement agreement was fair, reasonable, and adequate, and thus we affirm the district court's order approving the settlement. Further, because the court did not abuse its discretion in calculating attorneys' fees and because the Rule 23(h) violation was harmless, we affirm the court's order awarding attorneys' fees and expenses.

———————————————